NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 210284-U

NO. 4-21-0284

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 2, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| CAROL CLEETON, as Independent Administrator of the Estate of Donald Cleeton, Deceased, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellant, | ) | Sangamon County |
| v. | ) | No. 19L32 |
| SIU HEALTHCARE, INC.; CHARLENE YOUNG; ABDULLAH AL SAWAF; SIU PHYSICIANS & SURGEONS, INC., d/b/a SIU MEDICINE, an Illinois Corporation; STEPHANIE WHOOLEY; SUE FERRILL; ASHLEY KOCHMAN; and MEDTRONIC, INC., | ) ) ) ) ) | |
| Defendants, and | ) ) | |
| MEMORIAL MEDICAL CENTER; MOUHAMAD BAKIR; JESSICA FARLEY; NAUMAN JAHANGIR; HANNAH PURSEGLOVE; NATALIE MAHONEY; JONATHAN RODERICK DUTT; AND SHILPA CHAKU, | ) ) ) ) ) | |
| Respondents in Discovery | ) ) | Honorable Raylene Grischow, |
| (Mouhamad Bakir, Appellee). | ) | Judge Presiding. |

JUSTICE TURNER delivered the judgment of the court.
Justices DeArmond and Holder White concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The circuit court properly denied plaintiff's motion to convert respondent in discovery, Dr. Mouhamed Bakir, to a defendant.

¶ 2       Plaintiff, Carol Cleeton, as the independent administrator of the estate of Donald

Cleeton, deceased, appeals the Sangamon County circuit court's May 3, 2021, order denying her

motion to convert Dr. Mouhamad Bakir from a respondent in discovery to a defendant under

section 2-402 of the Code of Civil Procedure (Procedure Code) (735 ILCS 5/2-402 (West 2018)).

The order also terminated Dr. Bakir's status as a respondent in discovery. On appeal, plaintiff contends the circuit court erred by denying her motion to convert Dr. Bakir to a defendant because (1) it failed to apply the proper standard of probable cause; (2) it erred in finding plaintiff failed to establish the standard of care applicable to Dr. Bakir; (3) it exceeded its authority by determining decedent's signs and symptoms were inconsistent with baclofen withdrawal syndrome; (4) it exceeded its authority by determining Dr. Bakir complied with the standard of care; and (5) the evidence supports the opinion of Dr. William Minore, plaintiff's expert witness, decedent died from baclofen withdrawal syndrome. We affirm.

¶ 3                                            I. BACKGROUND

¶ 4            When he was 17 years old, decedent sustained a cervical cord injury that left him a quadriplegic. In December 2014, Dr. Jose Espinosa implanted a Medtronic SynchroMed II programmable pump in decedent to reduce the extent of involuntary muscle spasms decedent experienced. The pump delivered baclofen, which is also known as Lioresal Intrathecal, for spasticity control. After the implantation, decedent's pump was managed by the Southern Illinois University (SIU) Department of Neurology, specifically defendant Charlene Young, a family nurse practitioner, and her clinic nurse, Ashley Kochman. Young and Kochman were employees of defendant SIU Healthcare, Inc.

¶ 5            On October 25, 2017, decedent, then 25 years old, presented with plaintiff, his mother, at the SIU Neurology clinic for a routine pump refill. Kochman and Young unsuccessfully attempted to refill decedent's pump multiple times. Young was eventually able to refill decedent's pump.

¶ 6            On October 29, 2017, around 8:15 p.m., decedent was brought by ambulance to the Memorial Medical Center emergency room because decedent was complaining of abdominal

pain and a headache following his pump refill. Decedent also noted increased spasms since the refill. He also recently had a urinary tract infection. Decedent was seen in the emergency room by Dr. Richard Austin. At 8:30 p.m., Dr. Austin consulted Dr. Nauman Jahangir, a neurology resident. The emergency room notes stated Dr. Jahangir recommended having a Medtronic representative interrogate the device. A Medtronic representative came to the emergency room and interrogated decedent's pump. The interrogation showed no functional error with the pump. The emergency room notes for decedent contain diagnoses of sepsis and acute urinary tract infection. Dr. Austin admitted decedent to the hospital and transferred decedent's care shortly before midnight. In transferring care of decedent, Dr. Austin spoke with Dr. Nichole Mirocha.

¶ 7 On October 30, 2017, Dr. Mirocha telephoned Dr. Bakir, a pulmonary critical care specialist, to have decedent transferred to the intensive care unit (ICU) to address tachycardia, altered mentation, and possible seizures. Dr. Mirocha provided Dr. Bakir with decedent's history, including the interrogation of decedent's baclofen pump in the emergency room. Decedent was transferred to the ICU around 10 a.m., and Dr. Bakir became decedent's managing physician. Dr. Keivan Shalileh, a pulmonary medicine fellow, and Dr. Hannah Purseglove, a resident, were also working in the ICU that day. As a pulmonary critical care specialist, Dr. Bakir was aware of baclofen, but the baclofen pump was not part of his intensive care and pulmonology practice. Prior to October 30, 2017, Dr. Bakir had never had a patient who potentially was experiencing baclofen withdrawal syndrome. Dr. Bakir did a review of decedent's chart, examined decedent, and spoke with plaintiff, who informed him of decedent's difficult pump refill on October 25, 2017. Due to decedent's heart rate, Dr. Bakir immediately consulted cardiology. Dr. Momin Siddique, a cardiologist, responded and ordered tests investigating a possible pulmonary embolism and decedent's elevated troponin level. Dr. Bakir

also consulted neurology, neurosurgery, and the baclofen pump team.

¶ 8        At 10:44 a.m., a Medtronic employee faxed the emergency procedures for baclofen withdrawal to Memorial Medical Center (Medtronic emergency procedure documents), after receiving a request for troubleshooting assistance with decedent's pump.  The Medtronic emergency procedure documents were incorporated into Memorial Medical Center's electronic medical records for decedent at 6:44 p.m. on October 30, 2017.  In his deposition, Dr. Bakir testified the Medtronic emergency procedure documents were never provided to him while he was caring for decedent.

¶ 9        Around 11:15 a.m., Dr. Abdullah Al Sawaf, a neurologist, and Dr. Shilpa Chaku, a neurology resident, examined decedent.  Dr. Al Sawaf's differential diagnosis for decedent was "mild-moderate baclofen withdrawal vs sepsis (?urine source)."  He noted decedent's "[n]ormal tone argues against baclofen withdrawal, but the timeline of events and dysautonomia supports that possibility."  Dr. Al Sawaf further found sepsis could present similarly.  He asked Young to interrogate decedent's pump to rule out failure.  Young did so and reported the pump was working as expected.  Dr. Al Sawaf found decedent's episodes in which his eyes would roll back and flutter were likely a dysautonomia phenomenon and not seizures.  After Dr. Al Sawaf examined decedent, he and his team spoke with Dr. Bakir and the ICU team about decedent's case.  During the discussion, both Dr. Bakir and Dr. Al Sawaf indicated their lack of familiarity with baclofen withdrawal syndrome.  Dr. Al Sawaf stated he did not think it was baclofen withdrawal syndrome because decedent's tone was normal.  No discussion took place about a possible pump catheter malfunction.

¶ 10        A code blue was called for decedent around 12:07 p.m. due to a lack of pulse. During the code, Dr. Espinosa recommended intrathecal administration of baclofen, which was

- 4 -

given by Dr. Todd Knox at 2:05 p.m. After three hours of resuscitation efforts, decedent was declared dead at 3:06 p.m. Later tests revealed the catheter for decedent's pump had holes in it.

¶ 11 In February 2019, plaintiff filed her wrongful death action against SIU Healthcare, Inc.; Young; and Dr. Al Sawaf. The following were named as respondents in discovery: Memorial Medical Center, Dr. Austin, Dr. Knox, Dr. Bakir, Medtronic, Inc., Dr. Mirocha, Jessica Farley, Sue Ferrill, and Stephanie Whooley. Farley was an emergency room nurse who cared for decedent when he was in the emergency room, and Ferrill and Whooley were employees of Medtronic. As the case progressed, additional defendants were added, as well as respondents in discovery. In September 2019, plaintiff filed a motion to extend Dr. Bakir's status as a respondent in discovery. Dr. Bakir filed a response to plaintiff's motion and a motion to terminate his status as a respondent in discovery. The circuit court granted plaintiff's motion and imposed a deadline of November 13, 2019, to convert Dr. Bakir as a defendant. Plaintiff sought another extension of Dr. Bakir's status as a respondent in discovery, and Dr. Bakir objected.

¶ 12 In November 2019, plaintiff filed a motion to convert Dr. Bakir from a respondent in discovery to a defendant pursuant to section 2-402 of the Procedure Code (735 ILCS 5/2-402 (West 2018)). With the motion, plaintiff filed a certificate of merit by Dr. Minore and proposed counts XXII (wrongful death) and XXIII (survival action) against Dr. Bakir. In his certificate, Dr. Minore opined, within a reasonable degree of medical certainty and based upon a review of the medical records provided by Memorial Medical Center, Dr. Bakir deviated from the standard of care by his failure to timely recognize the differential diagnosis of baclofen withdrawal syndrome, order treatment consistent with the Medtronic emergency procedures, and order the administration of intrathecal baclofen in a timely manner.

¶ 13       Proposed counts XXII and XXIII alleged decedent was transferred to Memorial Medical Center's intensive care unit at 12:01 p.m. on October 30, 2017, and came under Dr. Bakir's care. (The aforementioned time was not supported by the evidence). That same day, Memorial Medical Center received the emergency procedure documents for baclofen withdrawal syndrome from Medtronic at 10:44 a.m. At 11:14 a.m., Bakir had been notified decedent's troponin levels were elevated, an indication for baclofen withdrawal syndrome. Based upon the tests performed and the emergency procedures from Medtronic, it was clear decedent was suffering from baclofen withdrawal syndrome. Dr. Bakir did not order intrathecal baclofen until 1:38 p.m., which was not administered until 2:17 p.m. By that time, it was too late, and decedent died as a result of baclofen withdrawal syndrome. The counts alleged Dr. Bakir had a duty to provide adequate medical care, diagnosis, and treatment to his patients, including decedent, within the standard of care of a reasonably careful critical care physician. According to the counts, Dr. Bakir, contrary to his duty, committed one or more of the following negligent acts or omissions: (1) failed to timely recognize the differential diagnosis of baclofen withdrawal syndrome, (2) failed to order treatment consistent with the Medtronic emergency procedure documents, and (3) and failed to order the administration of intrathecal baclofen in a timely manner. As a direct and proximate result of one or more of Dr. Bakir's aforementioned acts or omissions, decedent sustained a lethal baclofen withdrawal that ultimately caused his death.

¶ 14       Dr. Bakir filed an objection to plaintiff's motion to convert and a memorandum of law supporting his objection. Dr. Bakir asserted the discovery refuted the assumptions and conclusions Dr. Minore reached in his certificate of merit, and thus plaintiff failed to establish probable cause for converting Dr. Bakir to a defendant. In support of his objection, Dr. Bakir referred to his deposition, Dr. Al Sawaf's deposition, and the answers to interrogatories by

- 6 -

Memorial Medical Center, Young, and Dr. Al Sawaf.

¶ 15　　　Plaintiff filed a reply to Dr. Bakir's objection, asserting, *inter alia*, the standard of care set forth by Dr. Minore was broader than the Medtronic emergency procedure documents and required Dr. Bakir to timely recognize baclofen withdrawal syndrome and timely order the administration of intrathecal baclofen to treat baclofen withdrawal syndrome. To the reply, plaintiff attached decedent's medical records, some materials from Medtronic, Dr. Bakir's deposition, and Dr. Shalileh's deposition.

¶ 16　　　On April 12, 2021, the circuit court heard arguments on plaintiff's motion to convert. The court took the matter under advisement and gave the parties 14 days to submit proposed orders. On May 3, 2021, the court entered its written order, denying plaintiff's motion to convert and terminating Dr. Bakir's status as a respondent in discovery. The court found (1) the Medtronic emergency procedure documents did not set forth the standard of care by which Dr. Bakir's conduct must be measured and, (2) even if the Medtronic emergency procedure documents did set forth the standard of care for Dr. Bakir, the evidence negates the basis upon which Dr. Minore relied upon in reaching his opinion a reasonable and meritorious cause existed for filing a medical malpractice action against Dr. Bakir. Included in the circuit court's order was a finding pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016) no just reason exists for delaying the enforcement or appeal from this order.

¶ 17　　　On May 18, 2021, plaintiff filed a timely notice of appeal in sufficient compliance with Illinois Supreme Court Rule 303 (eff. July 1, 2017). Accordingly, this court has jurisdiction under Rule 304(a).

¶ 18　　　　　　　　　　　　　　II. ANALYSIS

¶ 19　　　On appeal, plaintiff challenges the circuit court's denial of her request to convert

Dr. Bakir from a respondent in discovery to a defendant under section 2-402 of the Procedure Code (735 ILCS 5/2-402 (West 2018)).

¶ 20                                    A. Standard of Review

¶ 21        Reviewing courts have applied different standards of review for a circuit court's determination of whether to convert a respondent in discovery to a defendant under section 2-402. Illinois courts have reviewed the issue *de novo* under the following circumstances: "(1) the facts are undisputed, (2) the credibility of the witnesses is not an issue, and (3) in-court testimony has not been presented." *Jackson-Baker v. Immesoete*, 337 Ill. App. 3d 1090, 1093, 787 N.E.2d 874, 877 (2003). When the circuit court has made factual determinations regarding conflicting evidence, some cases have applied an abuse of discretion standard (*Long v. Mathew*, 336 Ill. App. 3d 595, 600, 783 N.E.2d 1076, 1080 (2003) (citing *Froehlich v. Sheehan*, 240 Ill. App. 3d 93, 103, 608 N.E.2d 889, 896 (1992)); *Ingle v. Hospital Sisters Health System*, 141 Ill. App. 3d 1057, 1065, 491 N.E.2d 139, 144 (1986)) while others have applied the manifest weight of the evidence standard (*McGee v. Heimburger*, 287 Ill. App. 3d 242, 248, 678 N.E.2d 364, 368 (1997) (citing *People v. Enis*, 163 Ill. 2d 367, 393, 645 N.E.2d 856, 867 (1994)). In this case, the circuit court did not hold an evidentiary hearing and the parties presented documentary evidence, but the circuit court noted in its written order it resolved conflicting evidence in making its determination. However, we can address the merits of this appeal on the uncontested evidence, and thus we apply the *de novo* standard of review.

¶ 22                              B. Probable Cause Under Section 2-402

¶ 23        Plaintiff contends the circuit court erred in its application of the probable cause standard contained in section 2-402. Since we are applying the *de novo* standard of review, we need not specifically address whether the circuit court properly applied the probable cause

standard. Instead, we will set forth the probable cause standard.

¶ 24        Section 2-402 allows plaintiffs to add respondents in discovery as defendants in a lawsuit where "the evidence discloses the existence of probable cause for such action." 735 ILCS 5/2-402 (West 2018). Illinois courts have explained the quantum of evidence necessary to establish probable cause under the statute as follows. "[T]he evidence necessary to establish the requisite probable cause need only be such as would lead a person of ordinary caution and prudence to believe or entertain an honest and strong suspicion that his injury was the proximate result of the tortious conduct of the respondent in discovery." *Williams v. Medenica*, 275 Ill. App. 3d 269, 272, 655 N.E.2d 1002, 1004 (1995) (citing *Froehlich*, 240 Ill. App. 3d at 100, 608 N.E.2d at 894; *Ingle*, 141 Ill. App. 3d at 1062, 491 N.E.2d at 142). However, the evidence "need not rise to the level of a high degree of likelihood of success on the merits or the evidence necessary to defeat a motion for summary judgment in favor of the respondents in discovery, nor is the plaintiff required to establish a *prima facie* case against the respondent in discovery." *Williams*, 275 Ill. App. 3d at 272, 655 N.E.2d at 1004 (citing *Ingle*, 141 Ill. App. 3d at 1062-65, 491 N.E.2d at 142-44). This court has described probable cause as a "low threshold." *McGee*, 287 Ill. App. 3d at 249, 678 N.E.2d at 368. However, we also have stated the circuit court's role was "gatekeeper—to simply assess whether it is fair to let the plaintiff proceed further against the respondents in discovery and subject them to the fact-finding process." *McGee*, 287 Ill. App. 3d at 247-48, 678 N.E.2d at 368. Further, before granting a motion to convert a respondent in discovery to a defendant, the court must hold an evidentiary hearing to review the discovery materials showing the plaintiff now has probable cause to name the respondent as a defendant. *Froehlich*, 240 Ill. App. 3d at 103, 608 N.E.2d at 896. Thus, the court considers the plaintiff's assertion of probable cause in light of the existing discovery to determine whether a person of

ordinary caution and prudence would believe or entertain an honest and strong suspicion the injury was the proximate result of the tortious conduct of the respondent in discovery.

¶ 25    Additionally, "[w]hat is sufficient to establish probable cause depends on the nature and complexity of the case." *Medjesky v. Cole*, 276 Ill. App. 3d 1061, 1064, 659 N.E.2d 47, 49 (1995). This court has recognized a medical malpractice case may require "a significantly greater amount of 'evidence' " than a negligence action based on a motor vehicle collision. *Medjesky*, 276 Ill. App. 3d at 1065, 659 N.E.2d at 49.

> " 'In a negligence medical malpractice case, the burden is on the plaintiff to prove the following elements of a cause of action: the proper standard of care against which the defendant physician's conduct is measured; an unskilled or negligent failure to comply with the applicable standard; and a resulting injury proximately caused by the physician's want of skill or care. [Citations.] Unless the physician's negligence is so grossly apparent or the treatment so common as to be within the everyday knowledge of a layperson, expert medical testimony is required to establish the standard of care and the defendant physician's deviation from that standard.' " *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 112, 806 N.E.2d 645, 653 (2004) (quoting *Purtill v. Hess*, 111 Ill. 2d 229, 241-42, 489 N.E.2d 867, 872 (1986).

¶ 26                          C. Proper Standard of Care

¶ 27    As stated, the plaintiff must first establish the proper standard of care against which the defendant physician's conduct is to be measured. *Sullivan*, 209 Ill. 2d at 112, 806 N.E.2d at 653. Plaintiff asserts the circuit court erred by finding she failed to establish the proper standard of care against which Dr. Bakir's conduct was to be measured. Specifically, plaintiff

contends the circuit court misinterpreted Dr. Minore's certificate of merit, and she did present evidence of the standard of care. Dr. Bakir contends the circuit court was correct in finding plaintiff relied upon the Medtronic Emergency procedures to establish a standard of care. We agree with Dr. Bakir.

¶ 28    "In a medical malpractice action, the plaintiff must establish the standards of care against which the physician's conduct is measured by the use of expert testimony." *Iaccino v. Anderson*, 406 Ill. App. 3d 397, 402, 940 N.E.2d 742, 747 (2010). "The standard of care requires the defendant to act with 'the same degree of knowledge, skill and ability as an ordinarily careful professional would exercise under similar circumstances.' " *Sekerez v. Rush University Medical Center*, 2011 IL App (1st) 090889, ¶ 58, 954 N.E.2d 383 (quoting *Longnecker v. Loyola University Medical Center*, 383 Ill. App. 3d 874, 885, 891 N.E.2d 954, 963 (2008)). For example, in *Sekerez*, 2011 IL App (1st) 090889, ¶ 59, the reviewing court noted the standard of care was established by the plaintiff's expert witness, who testified the standard of care for the administration of Lovenox was set by guidelines in the hospital's dosing card and the Physician's Desk Reference. The plaintiff's expert further testified a patient's creatine clearance must be calculated to determine if the patient's kidneys are functioning properly prior to administering Lovenox. *Sekerez*, 2011 IL App (1st) 090889, ¶ 59.

¶ 29    In his certificate of merit, Dr. Minore did not expressly set forth the standard of care for a pulmonary critical care specialist treating a critically ill patient with a baclofen pump in the intensive care unit and where the physician had consulted multiple specialists regarding that patient's care.

¶ 30    Here, we agree with the circuit court Dr. Minore attempted to establish the standard of care in his following statement: "Based upon a review of the tests performed, the

presentation of symptoms and the Emergency Procedures faxed by Medtronic representatives, it was clear that [decedent] was suffering from Baclofen Withdrawal Syndrome." (A similar statement is set forth in paragraph 16 of the proposed count XXII). The aforementioned statement can be read to provide the Medtronic emergency procedure documents are the standard of care for treating a critically ill patient with a baclofen pump and decedent's symptoms. Plaintiff's reliance on Medtronic's emergency procedure documents in establishing the standard of care is further evidenced by paragraph 14 of proposed count XXII, which contains an overview of the information in the documents. We further agree with the circuit court the Medtronic emergency procedure documents do not establish the standard of care for measuring Dr. Bakir's conduct. While Memorial Medical Center received the emergency procedure documents from Medtronic at 10:44 a.m. on October 30, 2017, Dr. Bakir testified in his deposition he never received those documents before decedent's death. No other evidence suggests Dr. Bakir did receive the documents prior to decedent's death.

¶ 31 On appeal, plaintiff attempts to avoid reliance on the Medtronic emergency procedure documents for the standard of care and contends Dr. Minore set forth the standard of care in the following paragraph:

"It is my opinion within a reasonable degree of medical certainty based upon a review of the medical records provided by Memorial Medical Center, that Mouhamad Bakir, M.D., deviated from the standard of care by his failure to timely recognize the differential diagnosis of Baclofen Withdrawal Syndrome, order treatment consistent with the Medtronic Emergency Procedures received at Memorial Medical Center at approximately 10:44 a.m. on October 30, 2017 and order the administration of Intrathecal Baclofen in a timely manner."

While the aforementioned opinion sets forth the ways in which Dr. Bakir allegedly deviated from the standard of care, it does not set forth the *actual* standard of care to which Dr. Bakir's conduct is to be measured. Plaintiff's arguments in her brief regarding the standard of care primarily focus on the alleged deviations from the standard of care as opposed to establishing the actual standard of care for a pulmonary critical care specialist. In fact, in her reply brief, plaintiff asserts she "clearly presented substantial 'evidence' including Dr. Minore's Certificate of Merit and the Plaintiff's medical records to establish probable cause that Bakir *breached the applicable standard of care*." (Emphasis added.)

¶ 32        Moreover, while decedent's medical records may show a deviation from the standard of care, plaintiff does not explain how those records establish the standard of care, which generally requires expert witness testimony (*Sullivan*, 209 Ill. 2d at 112, 806 N.E.2d at 653) and must be established first before addressing any possible deviation. Plaintiff further notes Dr. Bakir testified in his deposition he did have knowledge about baclofen and the symptoms of baclofen withdrawal syndrome. However, we agree with Dr. Bakir, knowledge about a syndrome and its symptoms does not establish the standard of care for a pulmonary critical care specialist. In his deposition, Dr. Bakir testified he was the managing physician for decedent in the ICU, and he had four teams working on decedent. Dr. Bakir worked on supporting decedent's heart rate, managing his blood pressure, and decedent's diagnosis of sepsis. He had other teams working on ruling out baclofen withdrawal syndrome from the differential diagnosis. Dr. Al Sawaf, the neurologist who was addressing the differential diagnosis of baclofen withdrawal syndrome, informed Dr. Bakir he did not think decedent was suffering from the syndrome based on decedent's normal tone. Moreover, Young had reported decedent's baclofen pump was working as expected. Expert testimony about the standard of care

- 13 -

was clearly needed to address this type of complex medical treatment. Thus, plaintiff's attempts to avoid reliance on the Medtronic emergency procedure documents fail because plaintiff did not set forth any expert testimony addressing Dr. Bakir's role as a managing physician with multiple teams of specialists working on decedent's complex medical case in the ICU. None of the cases plaintiff cites in support of her argument addressed a situation where the alleged deviation from the standard of care was being addressed by a consulting physician, who was supposed to have more expertise on the differential diagnosis at issue. Given Dr. Bakir's consultation of other medical professionals and no evidence on the standard of care in such a situation, the supporting evidence did not lead a person of ordinary caution and prudence to believe or entertain an honest and strong suspicion decedent's death was the proximate result of Dr. Bakir's conduct.

¶ 33        Accordingly, we find the circuit court properly found plaintiff failed to establish probable cause Dr. Bakir committed medical malpractice. Thus, we do not address plaintiff's other arguments.

¶ 34                        III. CONCLUSION

¶ 35        For the reasons stated, we affirm the Sangamon County circuit court's judgment.

¶ 36        Affirmed.