**2023 IL 128651**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

———————————

(Docket No. 128651)

CAROL CLEETON, Appellant, v. SIU
HEALTHCARE, INC., *et. al*. (Mouhamad Bakir, M.D., Appellee).

*Opinion filed May 18, 2023.*

JUSTICE NEVILLE delivered the judgment of the court, with opinion.

Chief Justice Theis and Justices Overstreet, Cunningham, Rochford, and O'Brien concurred in the judgment and opinion.

Justice Holder White took no part in the decision.

## OPINION

¶ 1   The plaintiff, Carol Cleeton, as the independent administrator of the estate of Donald Cleeton, the deceased, filed a multiple-count wrongful death action against the defendants SIU Healthcare, Inc.; Charlene Young; Abdullah Al Sawaf; SIU Physicians & Surgeons, Inc., doing business as SIU Medicine; Stephanie Whooley;

Sue Ferrill; Ashley Kochman; and Medtronic, Inc. (Medtronic), as well as the respondents in discovery Memorial Medical Center, Mouhamad Bakir, Jessica Farley, Nauman Jahangir, Hannah Purseglove, Natalie Mahoney, Jonathan Roderick Dutt, and Shilpa Chaku. The plaintiff filed a motion pursuant to section 2-402 of the Code of Civil Procedure (Code) (735 ILCS 5/2-402 (West 2018)) to convert a respondent in discovery to a defendant. The Sangamon County circuit court denied the motion, finding that the plaintiff did not present sufficient evidence to convert the respondent in discovery to a defendant. The appellate court affirmed the decision of the circuit court. 2022 IL App (4th) 210284-U, ¶ 35.

¶ 2        We allowed Carol's petition for leave to appeal pursuant to Illinois Supreme Court Rule 315 (eff. Oct. 1, 2021). We also allowed the Illinois Trial Lawyers Association to file an *amicus curiae* brief in support of the plaintiff's position, and we allowed the Illinois State Medical Society, American Medical Association, and the Illinois Association of Defense Trial Counsel to file *amicus curiae* briefs in support of the position taken by Dr. Bakir, the respondent in discovery. Ill. S. Ct. R. 345 (eff. Sept. 20, 2010). For the following reasons, we now reverse the judgment of the appellate court and remand the cause to the circuit court for further proceedings consistent with this opinion.

¶ 3                                    I. BACKGROUND

¶ 4                          A. Donald's Medical History and Care

¶ 5        When he was 17 years old, Donald incurred a cervical cord injury, which left him quadriplegic. To reduce Donald's involuntary muscle spasms (spasticity from the nerve damage), Dr. Jose Espinosa implanted a Medtronic SynchroMed II Infusion System. The Medtronic device was a programmable pump that delivered doses of baclofen into the intrathecal space of Donald's spine. The device consisted of two parts: the pump itself, which held and dispersed baclofen, and a catheter, which delivered baclofen from the pump into the intrathecal space of the spine. The pump was managed by the Southern Illinois University Department of Neurology (SIU Neurology) and required regular refills.

¶ 6        On October 25, 2017, Donald and his mother, Carol, presented at the SIU Neurology clinic for a routine pump refill. Charlene Young, F.N.P., and Ashley

Kochman, R.N., made failed attempts to refill Donald's pump before Young successfully refilled it. One of Kochman's attempts resulted in inserting the length of the refill needle into Donald's abdomen without making contact with the pump.

¶ 7 On October 29, 2017, Donald arrived at the Memorial Medical Center emergency room complaining that since his pump was refilled, he had a headache, abdominal pain, and increased spasms. Donald also reported that he had recently suffered from a urinary tract infection. Donald was evaluated by Dr. Richard Austin, who, *inter alia*, consulted the on-call neurology resident, Dr. Nauman Jahangir, who recommended having a Medtronic representative interrogate the device or test it for proper pump function. The interrogation revealed that the pump was functioning properly and delivering the correct dosage. Donald's emergency room notes contained a sepsis and acute urinary tract infection diagnosis. Dr. Austin admitted Donald to the hospital and transferred his care shortly before midnight. In transferring Donald's care, Dr. Austin spoke with Dr. Nichole Mirocha.

¶ 8 On October 30, 2017, Dr. Mirocha called pulmonary critical care specialist Dr. Bakir to have Donald transferred to the intensive care unit (ICU) to address tachycardia, altered mentation, and possible seizures. Dr. Mirocha shared Donald's medical history with Dr. Bakir, including the interrogation of his baclofen pump in the emergency room. Around 10 a.m., Donald was transferred to the ICU, where Dr. Bakir became Donald's managing physician. A pulmonary medicine fellow, Dr. Keivan Shalileh, and Dr. Hannah Purseglove, a resident, were also working in the ICU that day. Dr. Bakir was aware of baclofen; however, the baclofen pump was not part of his intensive care and pulmonology practice.

¶ 9 Prior to October 30, 2017, Dr. Bakir had never treated a patient who was potentially experiencing baclofen withdrawal syndrome (BWS). Dr. Bakir reviewed Donald's chart, examined him, and spoke with Carol, who informed him of the challenges with Donald's pump refill on October 25, 2017. Because of Donald's heart rate, Dr. Bakir immediately consulted cardiologist Momin Siddique, who ordered tests to investigate a possible pulmonary embolism as well as Donald's elevated troponin level. Dr. Bakir also consulted neurology, neurosurgery, and the baclofen pump team.

¶ 10 After receiving a request for troubleshooting assistance with Donald's pump, at 10:44 a.m., a Medtronic employee faxed the emergency procedures for baclofen

withdrawal to Memorial Medical Center. At 6:44 p.m. on October 30, 2017, the Medtronic emergency procedure documents were incorporated into Memorial Medical Center's electronic medical records for Donald. Dr. Bakir testified during his deposition that the Medtronic emergency procedure documents were never provided to him while he was caring for Donald.

¶ 11 Dr. Abdullah Al Sawaf, a neurologist, and Dr. Shilpa Chaku, a neurology resident, examined Donald around 11:15 a.m. on October 30, 2017. Dr. Al Sawaf's differential diagnosis for Donald was "mild-moderate baclofen withdrawal vs sepsis (urine source)." Specifically, Dr. Al Sawaf noted that Donald's "[n]ormal tone argues against baclofen withdrawal, but the timeline of events and dysautonomia supports that possibility." Dr. Al Sawaf also found that sepsis could present similarly. He also asked Young to interrogate Donald's pump to rule out failure, and Young reported that the pump was working as expected. Dr. Al Sawaf found that Donald's episodes where his eyes would roll back and flutter were not seizures but were likely a dysautonomia phenomenon. After examining Donald, Dr. Al Sawaf and his team spoke with Dr. Bakir and the ICU team about Donald's case. During the discussion, Dr. Bakir and Dr. Al Sawaf expressed a lack of familiarity with BWS. Dr. Al Sawaf stated he did not think it was BWS because Donald's tone was normal. There was no discussion about a possible pump catheter malfunction.

¶ 12 Around 12:07 p.m. on October 30, 2017, a code blue was called for Donald because of a lack of pulse. Dr. Espinosa recommended intrathecal administration of baclofen, which was given by Dr. Todd Knox at 2:05 p.m. Donald was pronounced dead at 3:06 p.m. after three hours of resuscitation efforts. Later tests revealed that the catheter for Donald's pump contained holes.

¶ 13        B. Circuit Court Proceedings

¶ 14 In February 2019, Carol filed a wrongful death action against SIU Healthcare, Inc.; Young; and Dr. Al Sawaf. She named, as respondents in discovery, the following: Memorial Medical Center, Dr. Austin, Dr. Knox, Dr. Bakir, Medtronic, Dr. Mirocha, Jessica Farley, Sue Ferrill, and Stephanie Whooley. Farley was a nurse who cared for Donald when he was in the emergency room, and Ferrill and Whooley were Medtronic employees. Additional defendants were added, as well as respondents in discovery as the litigation continued. In September 2019, Carol filed

a motion to extend Dr. Bakir's status as a respondent in discovery. Dr. Bakir filed a response to Carol's motion as well as a motion to terminate his status as a respondent in discovery. The circuit court granted Carol's motion and set a November 13, 2019, deadline to convert Dr. Bakir to a defendant. Carol sought another extension of Dr. Bakir's status as a respondent in discovery, to which Dr. Bakir objected.

¶ 15 In November 2019, Carol filed a motion to convert Dr. Bakir from a respondent in discovery to a defendant pursuant to section 2-402 of the Code. Carol attached to the motion a certificate of merit by Dr. William Stephen Minore, as well as proposed counts for the wrongful death and survival actions against Dr. Bakir. In his certificate, Dr. Minore opined that, based upon a review of the medical records provided by Memorial Medical Center and within a reasonable degree of medical certainty, Dr. Bakir deviated from the standard of care by his failure to "timely recognize the differential diagnosis of Baclofen Withdrawal Syndrome, order treatment consistent with the Medtronic Emergency Procedures received at Memorial Medical Center at approximately 10:44 a.m. on October 30, 2017, and order the administration of Intrathecal Baclofen in a timely manner."

¶ 16 Carol's proposed wrongful death and survival action counts (counts XXII and XXIII) alleged that Donald was transferred to Memorial Medical Center's ICU at 12:01 p.m. on October 30, 2017, and was seen by Dr. Bakir. That same day, Memorial Medical Center received from Medtronic the emergency procedure documents for BWS at 10:44 a.m. At 11:14 a.m., Dr. Bakir was notified that Donald's troponin levels were elevated, which was an indication of BWS. Based upon the tests performed and the emergency procedure documents transferred to Memorial Medical Center from Medtronic, it was evident that Donald was suffering from BWS. Dr. Bakir ordered intrathecal baclofen at 1:38 p.m., which was not administered until 2:17 p.m. By this time, it was too late, and Donald died because of BWS.

¶ 17 Both counts alleged that Dr. Bakir owed a duty to his patients, including Donald, to provide adequate medical care, diagnosis, and treatment within the standard of care of a reasonably careful physician. According to the proposed counts, Dr. Bakir breached that duty by committing one or more of the following negligent acts or omissions: (1) failing to timely recognize the differential diagnosis

of BWS, (2) failing to order treatment consistent with the Medtronic emergency procedure documents, and (3) failing to order the administration of intrathecal baclofen in a timely manner. As a direct and proximate result of one or more of Dr. Bakir's acts or omissions, Donald sustained a baclofen withdrawal that caused his death.

¶ 18 Dr. Bakir filed an objection to Carol's motion, arguing that the discovery refuted Dr. Minore's opinions and, therefore, Carol failed to establish probable cause to convert Dr. Bakir from a respondent in discovery to a defendant. In support of his objection, Dr. Bakir referenced his own deposition, Dr. Al Sawaf's deposition, and the answers to interrogatories filed by Memorial Medical Center, Young, and Dr. Al Sawaf.

¶ 19 Carol filed a reply to Dr. Bakir's objection, asserting, *inter alia*, that the standard of care set forth by Dr. Minore was broader than the Medtronic emergency procedure documents and required Dr. Bakir to timely recognize BWS and to timely order the administration of intrathecal baclofen to treat BWS. Carol attached to her reply Donald's medical records, materials from Medtronic, Dr. Bakir's deposition, and Dr. Shalileh's deposition.

¶ 20 On May 3, 2021, the circuit court entered a written order denying Carol's motion to convert and terminating Dr. Bakir's status as a respondent in discovery. In so doing, the circuit court found that (1) the Medtronic emergency procedure documents did not set forth the standard of care by which Dr. Bakir's conduct must be measured and, (2) even if the Medtronic emergency procedure documents did establish the standard of care for Dr. Bakir, the evidence does not support the basis upon which Dr. Minore relied in reaching his opinion that a reasonable and meritorious basis exists for filing a medical malpractice action against Dr. Bakir. The circuit court's order included a finding pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016) that no just reason exists for delaying the enforcement or appeal from the order.

¶ 21                                                  C. Appellate Court Proceedings

¶ 22 Carol filed a timely appeal challenging the circuit court's denial of her motion to convert Dr. Bakir from a respondent in discovery to a defendant under section 2-

402 of the Code (735 ILCS 5/2-402 (West 2018)). The appellate court affirmed the ruling of the circuit court. 2022 IL App (4th) 210284-U, ¶ 35. In so doing, the appellate court reasoned that Dr. Minore opined in his certificate of merit that Dr. Bakir deviated from the standard of care but failed to establish the proper standard of care, which, according to the appellate court, was a requirement to prove Carol's cause of action. *Id.* ¶¶ 25-33. Carol now appeals.

¶ 23                                    II. ANALYSIS

¶ 24        Carol maintains that the appellate court erred by affirming the circuit court's denial of her motion to convert Dr. Bakir from a respondent in discovery to a defendant pursuant to section 2-402 of the Code (735 ILCS 5/2-402 (West 2018)). Therefore, the sole issue before this court is whether Carol presented sufficient evidence, under section 2-402 of the Code, to convert Dr. Bakir from a respondent in discovery to a defendant.

¶ 25                                A. Standard of Review

¶ 26        A trial court is entitled to deference in its ruling when converting a respondent in discovery to a defendant only where the court heard testimony and made determinations about conflicting evidence. See *Jackson-Baker v. Immesoete*, 337 Ill. App. 3d 1090, 1093 (2003). However, where the circuit court only considered documentary evidence (depositions, transcripts, etc.), *de novo* review applies. *Addison Insurance Co. v. Fay*, 232 Ill. 2d 446, 453 (2009). We are not, at the respondent-in-discovery stage, determining the factual question of liability or determining whether Dr. Bakir is guilty of malpractice. Instead, we are considering the pleadings and documentary evidence to determine the legal question of whether, under section 2-402 of the Code, there is probable cause to proceed with the malpractice case against Dr. Bakir. Matters of statutory construction or interpretation present questions of law. *Board of Education of Chicago v. Moore*, 2021 IL 125785, ¶ 18 (statutory construction of a statute presents a question of law). Accordingly, because we are interpreting section 2-402 of the Code, a statute, and because we are reviewing an order based on documentary evidence, our review is *de novo*. *Rozsavolgyi v. City of Aurora*, 2017 IL 121048, ¶ 21; *People v. Stoecker*,

2014 IL 115756, ¶ 21.

¶ 27                              B. Probable Cause

¶ 28    The cardinal rule of statutory construction is to ascertain and give effect to the true intent of the legislature. *Illinois State Treasurer v. Illinois Workers' Compensation Comm'n*, 2015 IL 117418, ¶ 20; *Kunkel v. Walton*, 179 Ill. 2d 519, 533 (1997). The most reliable indicator of legislative intent is found in the statutory language, given its plain and ordinary meaning. *People v. McChriston*, 2014 IL 115310, ¶ 15. When construing a statute, courts are to assume that the legislature did not intend to produce absurd or unjust results. *Sheffler v. Commonwealth Edison Co.*, 2011 IL 110166, ¶ 77. When the statute contains undefined terms, we may rely on prior cases construing those terms. *Atlantic Mutual Insurance Co. v. American Academy of Orthopaedic Surgeons*, 315 Ill. App. 3d 552, 561 (2000) (reviewing courts may consider "Illinois case law for guidance as to the interpretation" of undefined statutory terms). In addition to considering the language chosen by the legislature, the court should also consider the reason for the law, the evil to be remedied, and the purpose to be obtained thereby. *In re A.G.*, 325 Ill. App. 3d 429, 434 (2001).

¶ 29    Section 2-402 of the Code is a statutory procedure whereby a plaintiff in a civil action is permitted to name as respondents in discovery

    "those individuals or other entities, other than the named defendants, believed by the plaintiff to have information essential to the determination of who should properly be named as additional defendants in the action.

        Persons or entities so named as respondents in discovery shall be required to respond to discovery by the plaintiff in the same manner as are defendants and may, on motion of the plaintiff, be added as defendants if the evidence discloses the existence of probable cause for such action.

                                   * * *

        A person or entity named as a respondent in discovery in any civil action may be made a defendant in the same action at any time within 6 months after being named as a respondent in discovery, even though the time during which

                                    - 8 -

an action may otherwise be initiated against him or her may have expired during such 6 month period." 735 ILCS 5/2-402 (West 2018).

¶ 30    According to the statute, a respondent in discovery may be added as a defendant where "the evidence discloses the existence of probable cause for such action." *Id.* The statute is not clear as to the amount of evidence needed to establish probable cause to convert a respondent in discovery to a defendant. However, we can trace the term "probable cause" to this court's definition in *Freides v. Sani-Mode Manufacturing Co.*, 33 Ill. 2d 291 (1965), a case involving a tort action for malicious prosecution. The *Freides* court stated: " 'Probable cause' has been defined in this usage [(malicious prosecution)] as 'such a state of facts, in the mind of the prosecutor, as would lead a man of ordinary caution and prudence to believe, or entertain an honest and strong suspicion that the person arrested is guilty.' [Citation.]" *Id.* at 295-96.

¶ 31    Similarly, Illinois courts have found that probable cause under section 2-402 of the Code is established where a person of ordinary caution and prudence would entertain an honest and strong suspicion that the purported negligence of the respondent in discovery was a proximate cause of plaintiff's injury. See *Jackson-Baker*, 337 Ill. App. 3d at 1093; *Froehlich v. Sheehan* 240 Ill. App. 3d 93, 100-02 (1992); *Ingle v. Hospital Sisters Health System*, 141 Ill. App. 3d 1057, 1062-65 (1986).

¶ 32    The standard to establish probable cause is low. See *Coley v. St. Bernard's Hospital*, 281 Ill. App. 3d 587, 592 (1996) (the standard for establishing probable cause "does not rise to the level of a high degree of likelihood of success on the merits or the evidence necessary to defeat a motion for summary judgment in favor of the respondents in discovery"); see also *Ingle*, 141 Ill. App. 3d at 1062-65. Whether evidence establishes probable cause should be liberally construed. *Coley*, 281 Ill. App. 3d at 592 ("the probable cause requirement of section 2-402 is to be liberally construed, to the end that controversies may be determined according to the substantive rights of the parties"); accord *Thompson v. Heydemann*, 231 Ill. App. 3d 578, 582 (1992) (noting that section 2-622 of the Code, requiring an affidavit from a health professional to file a medical malpractice complaint, should be liberally construed to allow cases to be "quickly and finally decided according to the substantive rights of the parties"). We are tasked with determining whether

Carol's evidence—pleadings and documentary evidence—were legally sufficient to establish probable cause under the statute. Based on Carol's pleadings and documentary evidence, we find that she has established probable cause to proceed with the action.

¶ 33 In determining the amount of evidence necessary to establish probable cause, the appellate court in *Moscardini v. Neurosurg, S.C.*, 269 Ill. App. 3d 329 (1994), considered the purpose behind section 2-402 of the Code and concluded that it is similar to section 2-622 of the Code (735 ILCS 5/2-622 (West 2018)). Section 2-622 requires a plaintiff in any medical malpractice action to attach an attorney affidavit to the complaint averring that he has consulted with a healthcare professional who has opined there is a "reasonable and meritorious" cause for filing an action against the defendant. *Moscardini*, 269 Ill. App. 3d at 334 (citing 735 ILCS 5/2-622(a) (West 1992)). Additionally, the complaint must be accompanied by a written report from the consulted healthcare professional indicating the basis for his determination and his qualifications. *Id.*

¶ 34 The *Moscardini* court observed that, in enacting section 2-402 of the Code, like section 2-622, the legislature intended to ensure that plaintiffs file only meritorious medical malpractice actions and to eliminate frivolous actions at the pleadings stage. *Id.* Because of the similar purpose of these two sections, the *Moscardini* court concluded that they must be read together as concerning the same subject matter. *Id.* at 335-36. The *Moscardini* court held:

"Given the similarity in the goals of the two provisions, it is virtually inconceivable that the legislature intended the term 'evidence' used in section 2-402 to require a signed, verified report, whereas an unsigned, unverified report, combined with an attorney's affidavit, suffices under section 2-622. By enacting section 2-622 as it did, the legislature concluded that an unsigned letter from a health professional, combined with an attorney's affidavit, was sufficient to ensure the meritoriousness of a medical malpractice claim. There is no reason to believe that a similar letter and affidavit, based on the information obtained during the statutory discovery period, could not be sufficient to satisfy the probable cause requirement of section 2-402." *Id.* at 336.

¶ 35 The *Ingle* court found that the evidence needed to establish probable cause is low (*Ingle*, 141 Ill. App. 3d at 1062-65), and courts since *Ingle* have reinforced this

standard such that the probable cause requirement of section 2-402 is liberally construed, to the end that controversies may be determined according to the substantive rights of the parties (*Coley*, 281 Ill. App. 3d at 592).

¶ 36    Specifically, the appellate court in *Ingle*, 141 Ill. App. 3d at 1062-65, found that affidavits, X-rays, and discovery depositions of respondents in discovery in a medical malpractice case were sufficient to establish probable cause to convert the respondents in discovery to defendants. The *Ingle* court found:

> "We have no reason to believe that the legislature intended that the probable cause issue under section 2-402 was to be decided upon the basis of considerations that would be present in ruling on a motion for summary judgment for the respondents-in-discovery. Nor do we believe that the plaintiff is required to show a *prima facie* case in order to require that respondents be made defendants. If such showing were required, the proof here would be insufficient to carry the day for plaintiff. Rather, the question is one of whether there exists an 'honest and strong suspicion' that the respondents-in-discovery are liable. We recognize the deference that must be given to the trier of fact, but that determination goes not to the question of liability but as to the reasonableness of plaintiff's proceeding further against the respondents-in-discovery and subjecting them to the fact-finding process. Here, probable cause existed as a matter of law." *Id.* at 1064-65.

¶ 37    Similarly, the appellate court in *Williams v. Medenica*, 275 Ill. App. 3d 269, 273-74 (1995), found that probable cause existed for the conversion of physicians named as respondents in discovery in a medical malpractice action into defendants, where the affidavit submitted by a physician on behalf of the patient would engender in an ordinary person an honest and strong suspicion that the physicians breached the applicable standard of care. Specifically, the *Williams* court reasoned:

> "While the affidavit of Dr. Brown was not as precise and skillfully drafted as it might have been, the fact remains that Dr. Brown stated that the plaintiff's medical records fail to reveal appropriate antibiotic coverage for an ongoing infectious process reflecting a similar deficiency in the care afforded to the plaintiff resulting in an infection of his knee. His opinions are stated to be based upon a reasonable degree of medical certainty and form the basis of his conclusion that reasonable and meritorious cause exists for the filing of an

- 11 -

action against the respondents in discovery. Whether the charting deficiencies noted in Dr. Brown's affidavit are, in fact, indicative of similar deficiencies in care or whether the respondents in discovery breached any standard of care owed to the plaintiff is a factual determination that must be made by a trier of fact. Suffice it to say, we find that Dr. Brown's affidavit would engender, in an ordinary and prudent person, an honest and strong suspicion that the respondents in discovery breached the applicable standard of care and that their breach proximately resulted in injury to the plaintiff. Put another way, the affidavit satisfied the probable cause requirement of section 2-402." *Id.*

¶ 38    We find that the *Moscardini*, *Ingle*, and *Williams* courts correctly construed section 2-402 of the Code. Moreover, we find that the result and reasoning in *Williams* is instructive to the case on review. Carol attached a certificate of merit by Dr. Minore, as well as proposed counts for the wrongful death and survival actions against Dr. Bakir, to her motion to convert. In his certificate, Dr. Minore opined that, within a reasonable degree of medical certainty, Dr. Bakir deviated from the standard of care by his failure to "timely recognize the differential diagnosis of Baclofen Withdrawal Syndrome, order treatment consistent with the Medtronic Emergency Procedures received at Memorial Medical Center at approximately 10:44 a.m. on October 30, 2017, and order the administration of Intrathecal Baclofen in a timely manner." Dr. Minore's affidavit may not have stated the specific standard of care from which Dr. Bakir deviated, but it did provide the court with sufficient information about what Dr. Bakir failed to do based upon a reasonable degree of medical certainty—timely recognize that Donald suffered from BWS, timely order treatment, and timely administer that treatment. Whether these failures deviated from the standard of care and actually caused Donald's death is a question for the trier of fact. But at present, our question is whether Carol presented sufficient documentary evidence such that an ordinary and prudent person would have an honest and strong suspicion that the respondent in discovery breached the applicable standard of care and that the respondent in discovery is liable for causing plaintiff's injury. The evidence threshold in section 2-402 of the Code was met in this case.

¶ 39    We note that, during oral argument before this court, Carol argued that, prior to the promulgation of section 2-402 in its present form, the landscape of the medical malpractice arena was very different. Prior to section 2-402, a plaintiff would often

sue everyone and anyone who *may* have caused, or in any way contributed to, the plaintiff's injury. This resulted in lawsuits naming numerous defendants who were later dismissed. However, during that time, plaintiffs felt compelled to name numerous defendants for fear of missing a culpable person and later being held liable for that omission. Additionally, those individuals who had been named as defendants, only to be later dismissed, found themselves exposed to increases in medical malpractice insurance premiums for having been named as a defendant, albeit erroneously.

¶ 40    To remedy that situation, the legislature enacted section 2-402, which provides an opportunity for plaintiffs to name individuals as respondents in discovery and engage in some discovery before deciding whether an individual meets the threshold to be converted to a defendant. It also provides the respondent in discovery the option to seek conversion to defendant status or be dismissed.

¶ 41    A review of the legislative history establishes that the statute was designed to provide both plaintiffs and respondents in discovery an opportunity to determine whether the individual respondent in discovery should be converted to a defendant. 79th Ill. Gen. Assem., House Proceedings, June 10, 1976, at 32-35; 79th Ill. Gen. Assem., House Proceedings, June 11, 1976, at 17, 27. Inherent in the legislative history, as evidenced by the discussions among the legislators and language of the statute itself, was the principle that the plaintiff would not have to *prove* his or her case at the discovery stage. Instead, the threshold the plaintiff must meet is to present evidence that would establish a reasonable probability that the respondent in discovery could be liable for the plaintiff's injury. At the discovery stage, the threshold is sufficiently low to allow the plaintiff to convert a respondent in discovery to a defendant. Certainly, one of the underlying purposes of the statute was to protect medical providers. However, there is no indication in the legislative history that the legislators intended to make it more difficult for a plaintiff to name a defendant or convert a respondent in discovery to a defendant.

¶ 42    The trial court in the case on review misapprehended section 2-402 and its underlying purpose. The court's comments and rulings suggest that the court believed Carol was required to meet a higher threshold—present evidence that would establish more than a reasonable probability that defendant could be liable— to convert a respondent in discovery to a defendant than would be required if

- 13 -

plaintiff had sued defendant initially without first utilizing the respondent in discovery process. Finally, to read section 2-402 as the trial court did adds burdens on plaintiffs the legislature never intended.

¶ 43                                    III. CONCLUSION

¶ 44        We find, under section 2-402 of the Code, that the plaintiff is to present such evidence (*e.g.*, affidavits, discovery depositions, medical records, reports, X-rays) that there exists an honest and strong suspicion that the respondents in discovery caused the plaintiff's injuries. *Ingle*, 141 Ill. App. 3d at 1064-65. We also find that Carol's pleadings and documentary evidence were legally sufficient to establish probable cause under section 2-402 of the Code: the evidence would cause a person of ordinary caution and prudence to develop an honest and strong suspicion that the purported negligence of the respondent was a proximate cause of plaintiff's injuries. Therefore, we hold that Carol presented sufficient evidence to establish probable cause for converting Dr. Bakir from a respondent in discovery to a defendant. Accordingly, we reverse the judgment of the appellate court, we reverse the judgment of the circuit court, and we remand the cause to the circuit court for further proceedings consistent with this opinion.

¶ 45        Judgments reversed.

¶ 46        Cause remanded.

¶ 47        JUSTICE HOLDER WHITE took no part in the consideration or decision of this case.