2025 IL App (4th) 241120-U

NO. 4-24-1120

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

FILED
September 15, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| TODD KENT, | ) | Appeal from the |
| Plaintiff-Appellant, | ) | Circuit Court of |
| v. | ) | Peoria County |
| AMISH PATEL, M.D.; AMANDA PARKER, PA; THE | ) | No. 23LA7 |
| METHODIST MEDICAL CENTER FOUNDATION; | ) | |
| THE METHODIST MEDICAL CENTER OF ILLINOIS; | ) | |
| IOWA PHYSICIANS CLINICAL MEDICAL | ) | |
| FOUNDATION; IOWA HEALTH SYSTEM; ACUTE | ) | |
| CARE SURGERY OF SOUTH DAKOTA, P.C.; | ) | |
| METHODIST HEALTH SERVICES CORPORATION; | ) | |
| IOWA HEALTH ACCOUNTABLE CARE, L.C.; | ) | |
| GENERATIONS AT PEORIA, LLC.; GENERATIONS | ) | |
| HEALTHCARE NETWORK, LLC.; GENERATIONS | ) | |
| HEALTHCARE PROPERTY OF PEORIA, LLC; | ) | |
| GENERATIONS HEALTHCARE CONSULTANTS, | ) | |
| LLC; ACCOLADE HEALTHCARE OF PEORIA, LLC.; | ) | |
| ACCOLADE HEALTHCARE, LLC., CHARLES | ) | |
| STEIGER, M.D.; STEIGER UROLOGY, P.C.; ALINE | ) | |
| AZAR, M.D.; PRAVEEN SUDHINDRA, M.D.; JACOB | ) | |
| HOPPING, M.D.; APRIL SZAFRAN, M.D.; ANIL | ) | |
| REDDIVARI, M.D.; and NICHOLAS GRIECO, M.D. | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| (Jeremy Good, PA-C; Greg Neri, M.D.; Jon Kim Jr., | ) | Honorable |
| D.O., and Specialists in Medical Imaging, S.C., | ) | Stewart J. Umholtz, |
| Respondents in Discovery-Appellees). | ) | Judge Presiding. |

JUSTICE GRISCHOW delivered the judgment of the court.
Justices Knecht and Cavanagh concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The appellate court affirmed in part and reversed in part, concluding (1) the trial
court did not abuse its discretion in (a) denying plaintiff's motion to convert three

respondents in discovery to defendants, (b) striking plaintiff's amended expert reports, and (c) denying plaintiff's motion to supplement his motion to reconsider; (2) the court abused its discretion in denying the conversion of one respondent in discovery to a defendant; and (3) plaintiff forfeited his argument regarding the court's denial of his motion to reconsider the denial of conversion.

¶ 2 On January 12, 2023, plaintiff, Todd Kent, filed a complaint against numerous physicians and healthcare entities, alleging their negligence for failing to timely diagnose and treat necrotizing fasciitis in his penis (known as Fournier's gangrene) resulting in penile amputation. On June 8, 2023, plaintiff was granted leave to file a second amended complaint wherein he named numerous individuals and entities as respondents in discovery, including Jeremy Good, Dr. Greg Neri, Dr. Jon Kim Jr., and Specialists in Medical Imaging, S.C. (Specialists). Good is a certified physician assistant in urology at Unity Point Methodist Hospital (Unity Point). Dr. Neri and Dr. Kim are radiologists who work for Specialists, a company that provides radiology services for Unity Point and other hospitals.

¶ 3 The parties began the discovery process, and on December 21, 2023, plaintiff filed a motion seeking to convert numerous respondents in discovery to defendants. Dr. Kim, Dr. Neri, and Specialists (collectively, Specialists respondents) filed a motion to strike new evidence presented by plaintiff in his written reply to their response to the motion. The motion to strike was granted. On March 6, 2024, the trial court found insufficient probable cause to convert Good to a defendant and terminated Good as a respondent in discovery. The court also found no probable cause to convert Specialists respondents to defendants and terminated them as respondents in discovery. In making this decision, the court deemed it a final order with respect to these respondents in discovery and found no just reason to delay an appeal.

¶ 4 On appeal, plaintiff argues the trial court erred in (1) denying his motion to convert Good, Dr. Kim, Dr. Neri, and Specialists to defendants under section 2-402 of the Code

of Civil Procedure (Code) (735 ILCS 5/2-402 (West 2022)), (2) striking and refusing to consider plaintiff's amended healthcare provider reports (wherein certifying physicians provided their qualifications and the bases for the determination of merit) (hereinafter expert reports) before ruling on the motion to convert Specialists respondents, (3) denying plaintiff's motion to supplement his motion for reconsideration with a new basis and evidence, and (4) denying his motion for reconsideration.

¶ 5                                    I. BACKGROUND

¶ 6                        A. Plaintiff's Medical Condition and Treatment

¶ 7            In 2021, plaintiff, who was 57 years old, was a resident at Generations Nursing Home recovering from a stroke. Plaintiff suffered from a neurogenic bladder, requiring him to have a chronic Foley catheter in place. In June, he had been treated for a urinary tract infection (UTI), and he was scheduled to follow up with his urologist about the placement of a suprapubic catheter. On the afternoon of July 11, plaintiff was transferred emergently to Unity Point, complaining of tremors, chills, fever, abdominal pain, and having a purulent discharge from his penis around his catheter for a few weeks. Plaintiff was diagnosed with sepsis and Systemic Inflammatory Response Syndrome traced back to the UTI.  Plaintiff was treated for his symptoms, and his Foley catheter was replaced.

¶ 8            An ultrasound and CT scan of plaintiff's abdomen and pelvis were ordered by Dr. Shabaz Mohammad Begum and performed that evening. The CT scan order indicated symptoms of abdominal pain and fever. The CT scan was performed at 9:58 p.m. at Unity Point and interpreted by Dr. Kim, who worked remotely from Austin, Texas, shortly thereafter. Dr. Kim's report was signed at 10:27 p.m. Dr. Kim reported there were "bladder stones versus calcifications" present around the catheter balloon and "questionable thickening of the bladder

which may reflect chronic cystitis, however acute on [*sic*] chronic process is not definitely excluded." He recommended a genitourinary consultation as clinically warranted. In his report, Dr. Kim did not identify the presence of air in plaintiff's penile soft tissue. However, over two years later, in response to interrogatories during discovery, Dr. Kim stated there appeared to be trace amounts of air present in certain images, and he attributed the air to the insertion of the Foley catheter, which had occurred before the CT scan.

¶ 9        On July 12, 2021, plaintiff was examined at 8:48 a.m. by Dr. Nicholas R. Grieco, a hospitalist, and his physician assistant, Aaron McLean. McLean reported plaintiff stated he was feeling better and no longer experiencing chills. The progress notes indicated they reviewed "any imaging studies," were managing plaintiff's infection, and were waiting for recommendations from urology. Dr. April Szafran, a urologist, saw plaintiff and charted her examination and findings at 12:20 p.m. Her notes reflected plaintiff's medical history, symptoms, and treatment, indicated his Foley catheter was changed at presentation, and confirmed plaintiff would have a suprapubic catheter placed after treatment of the UTI. Dr. Aline F. Azar, an infectious disease specialist, saw plaintiff that day as well. Dr. Azar charted her findings in plaintiff's medical record at 1:48 p.m., noting plaintiff's medical history, symptoms, and current care plan. She reviewed plaintiff's CT scan and assessed plaintiff would need 10 to 14 days of intravenous antibiotics, remained at risk for recurrent UTIs, and would eventually need a suprapubic catheter.

¶ 10        On July 13, 2021, Good's progress notes recorded at 10:40 a.m. presented plaintiff's history, review of his symptoms and medications, and results of a physical examination. Good's progress notes included plaintiff's laboratory test results, which showed a number of antibiotic-resistant bacteria in his blood and urine. Good's care plan confirmed plaintiff's Foley catheter was exchanged and would be kept to gravity drainage, follow up urine

- 4 -

cultures would be completed, and plaintiff would have a suprapubic catheter placed after treatment of his UTI, at which time bladder stones could be electively treated in the operating room. Good noted, "25 minutes of evaluation and management time was spent in reviewing patient's labs and over half of this time was spent in discussion with the patient." Dr. Charles Steiger was Good's supervising surgeon. Dr. Steiger's attestation stated he

> "reviewed the notes, assessment and/or procedures performed by Jeremy Good, I concur with her/his documentation of [plaintiff.] Once patient is over his acute cardiac issues and identification of a clear urine patient will then be scheduled for an operative procedure including cystoscopy [(a procedure to exam the lining of the bladder and urethra)] cystolitholopaxy [(removal of bladder stones)], and suprapubic tube placement."

Good saw plaintiff the following morning at 11:19 a.m. Dr. Steiger's attestation to Good's notes indicated he reviewed and concurred with the notes, assessments, and procedures performed by Good and stated, "We will plan to irrigate his catheter since there is debris in the fluid collection bag from his Foley otherwise urethral discharge is not noted today with no crepitus and or cellulitis noted around the shaft of the penis no induration of the suprapubic site."

¶ 11 Dr. Azar's attending notes indicated she saw plaintiff again on July 14, 2021. She recorded that plaintiff complained of discomfort in the pelvic region and continued to have the purulent drainage around his catheter. She ordered a transabdominal ultrasound of plaintiff's pelvis. Dr. Azar opined if plaintiff continued to experience pain and an elevated white blood cell count, but there was nothing revealing on the ultrasound, she would consider a repeat CT scan of his abdomen and pelvis. Dr. Azar noted she discussed plaintiff's care with Good the previous day. The ultrasound order was charted by Angela Gillespie, a certified physician assistant

specializing in infectious disease, at 3:30 p.m. This ultrasound was reviewed by Dr. Christine A. Wigginton, a radiologist, who signed her report at 10:34 p.m. However, in her report, Dr. Wigginton stated she discussed the findings with plaintiff's nurse that afternoon at 4:03 p.m. Dr. Wigginton's findings indicated a "heterogeneously-hyperechoic collection with 'dirty shadowing' that is concerning for gas within the soft tissues" located in the suprapubic region just superior to the base of the penis with "apparent involvement of the corpus cavernosum at the base of the penis." Dr. Wigginton stated there was "concern for gas and necrotizing fasciitis with possible involvement of the corpus cavernosum."

¶ 12        Gillespie charted at 3:30 p.m. on July 14, 2021, that she was called by plaintiff's nurse with the results of the ultrasound "showing concern for gas and necrotizing fasciitis with possible involvement of the corpus Cavernosa." Gillespie ordered a STAT CT scan of plaintiff's abdomen and pelvis and asked the nurse to notify urology. The CT scan order was charted at 4:16 p.m. Dr. Azar also charted the ultrasound results and the CT scan order at 5:03 p.m. At 5:57 p.m., a CT scan was performed. Dr. Neri, the radiologist who reviewed the scan remotely from Naperville, Illinois, signed his report at 7:18 p.m. Dr. Neri's findings indicated "[f]luid and gas are present in the corpora cavernosa dorsal to the proximal/bulbous portion of the penile urethra" and that this fluid and gas collection was "concerning for necrotizing fasciitis."

¶ 13        On July 14, 2021, at 4:49 p.m. (prior to the completion of Dr. Neri's CT scan report), Dr. Andrew J. Shadrach conducted a surgical consultation, noting "[u]ltrasound was done which showed possible necrotizing fasciitis." He observed "no concerning signs of necrotizing fasciitis on physical exam." Dr. Shadrach's notes indicated likely abscess formation, no acute surgical intervention was planned, and further recommendations were pending the CT scan's results.

¶ 14    Later on July 14, 2021, at 7:08 p.m., Dr. Steiger physically examined plaintiff after hours because the CT scan showed concerns of necrotizing fasciitis. Dr. Steiger indicated his physical examination of plaintiff was not consistent with Fournier's gangrene. He scheduled plaintiff for a cystoscopy "to assess if there is any evidence of urethral abnormalities that need to be addressed more emergently." He informed plaintiff and plaintiff's mother that the "findings again are inconsistent however that warrant further attention and this will be provided and done tomorrow with endoscopic examination under anesthesia."

¶ 15    At 6:55 a.m. on July 15, 2021, Dr. Paige Burnia provided a surgical consultation, indicating the CT scan was "concerning for abscess collection in the proximal penis" and "[s]urgery consulted due to concern for necrotizing fasciitis." Dr. Burnia noted plaintiff's physical exam "is not consistent with necrotizing fasciitis infection, no crepitus or overlying erythema to penis." After consulting with urology, Dr. Burnia reported "low concern for abscess formation per their review of CT scan." Dr. Jacob R. Hopping noted in plaintiff's medical record that he had examined plaintiff and there were no findings to suggest necrotizing fasciitis or Fournier's gangrene. Dr. Hopping assessed plaintiff's "penis is indurated and exquisitely painful, but without skin changes or crepitus," concluded there was no indication for general surgery involvement at the time, and recommended deferring management of the patient to urology.

¶ 16    At 1:19 p.m. on July 15, 2021, Dr. Praveen Sudhindra, a specialist in infectious diseases and critical care, examined plaintiff and noted the July 14 CT scan showed fluid and gas collection in the proximal corpora cavernosa, which was concerning for necrotizing fasciitis. Dr. Sudhindra charted "concerns raised for deeper soft tissue infection" based on the ultrasound and CT scans, and plaintiff was scheduled for cystoscopy to help decide if surgical exploration was needed.

¶ 17        Later that day, plaintiff underwent the following surgical procedures: cystoscopy, cystolitholopaxy, and bladder washing. Dr. Steiger performed these procedures and charted his operation notes at 4:23 p.m. Dr. Steiger noted he discussed with plaintiff that his CT scan showed gas pockets within the lumen of his bladder which required further investigation to identify any abnormalities that might need to be addressed more aggressively, including investigating any indications of Fournier's gangrene. In his postoperative description of the procedure, Dr. Steiger stated, "There was no evidence of gross anomalies that would indicate Fournier's gangrene within the urethral channel and the examination under anesthesia again failed to reveal any gross anomalies that would indicate that there is necrotizing fasciitis on setting at this point."

¶ 18        Plaintiff's condition continued to worsen, and, at some time thereafter, he was diagnosed with necrotizing fasciitis and Fournier's gangrene. Plaintiff continued to receive treatment at Unity Point until he was transferred to St. John's Hospital on July 22, 2021. Two days later, plaintiff underwent a total penectomy and continued further treatment through August 6, 2021, to control the infection.

¶ 19                          B. Malpractice Complaint

¶ 20        On January 12, 2023, plaintiff filed a complaint against numerous physicians and healthcare entities, alleging their negligence for failing to timely diagnose and treat Fournier's gangrene, resulting in his penile amputation. He subsequently filed an amended complaint. On June 8, 2023, plaintiff was granted leave to file his 23-count second amended complaint, wherein he named 14 individuals or entities as respondents in discovery, including Good, Dr. Neri, Dr. Kim, and Specialists.

¶ 21 Discovery commenced. As the deadline for conversion approached, plaintiff filed a motion to extend the deadline for all 14 respondents in discovery, which was granted. The deadline was extended to January 8, 2024. Thereafter, a number of the respondents in discovery agreed to a subsequent extension of the deadline for conversion to April 26, 2025. Good, Dr. Neri, Dr. Kim, and Specialists were not among those respondents in discovery who agreed to this extension.

¶ 22 C. Motion to Convert Respondents in Discovery to Defendants

¶ 23 On December 21, 2023, plaintiff filed a motion seeking to convert Good, Dr. Kim, Dr. Neri, Specialists, and Dr. Hopping (not a party to this appeal) from respondents in discovery to defendants pursuant to section 2-402 of the Code (735 ILCS 5/2-402 (West 2022)). In support of his motion, plaintiff attached a 118-page proposed third amended complaint with its accompanying nine section 2-622 (*id.* § 2-622) attorney affidavits (attesting that the attorney consulted with healthcare professionals, who opined there was a reasonable and meritorious cause for filing an action against each respondent in discovery) and the accompanying eight healthcare provider reports (wherein certifying physicians provided their qualifications and the bases for the determination of merit). Plaintiff argued the documents provided to the trial court satisfied the probable cause standard for conversion of these respondents in discovery in accordance with *Cleeton v. SIU Healthcare, Inc.*, 2023 IL 128651.

¶ 24 1. *Jeremy Good*

¶ 25 a. Motion and Responses Regarding Conversion of Good

¶ 26 In support of plaintiff's motion to convert Good from a respondent in discovery to a defendant, plaintiff attached a proposed third amended complaint. In count 11, plaintiff alleged Good was a physician assistant specializing in urology under the supervision of Dr. Steiger and

Dr. Steiger was Good's "collaborating physician" who supervised Good's care and treatment of plaintiff during his stay at Unity Point. Plaintiff alleged Good was negligent in numerous ways, including failing to review plaintiff's imaging studies, properly diagnose plaintiff's condition, treat plaintiff's condition, order proper additional tests, obtain additional consultations, recommend proper treatment to other physicians, and use the requisite skill, knowledge, and care of a reasonably competent urology physician assistant.

¶ 27 The expert report accompanying plaintiff's counsel's section 2-622 attorney affidavit was from a board certified urologist, who stated he was familiar with the standard of care applicable to Good as a physician assistant providing care and treatment for plaintiff. In reviewing plaintiff's medical records, the expert noted Good saw plaintiff during morning hospital rounds on July 13, 14, 15, and 16, 2021. On July 13, Good's note reflected he reviewed plaintiff's labs, chart, medication, and notes but did not mention a review of the CT scan performed on July 11. According to the report, Good documented " 'no new concerns overnight' and that urology will follow [plaintiff]." On July 14, Good noted again " ' no new urological concerns overnight' " and added to the care plan irrigation of plaintiff's bladder and application of Bacitracin around the tip of plaintiff's penis. On July 15, Good noted plaintiff was experiencing "penile pain, persistent leukocytosis, and penile discharge." Good's notes did not reflect a review of the July 14 ultrasound or CT scan. Good's care plan indicated "flexible cystoscopy with possible intravesical flushing with Dr. Steiger." On July 16, Good noted "bruising on the glans penis." His care plan was to "keep the urethral catheter in place for two weeks to bridge the urethral tear in the bulbous urethra." Good did not see plaintiff after this date.

¶ 28      After reviewing Good's performance in context with the extensive medical treatments and testing performed on plaintiff by numerous other physicians and healthcare providers at Unity Point, the expert opined that Good violated the standard of care required of a physician assistant on each date he saw plaintiff. Most notably, the expert opined Good violated the standard of care by (1) not reviewing plaintiff's CT scans and ultrasounds or appreciating the significance of the findings; (2) failing to form a differential diagnosis for plaintiff's condition based on examination, laboratory results, discussions with consultants, and radiographic studies; (3) not reviewing the July 11 CT scan and recognizing it showed a corporal abscess; (4) failing to realize the corporal abscess would not heal without surgical incision and drainage and failing to recommend this procedure and placement of a suprapubic catheter to Dr. Steiger; (5) not reviewing the July 14 ultrasound and CT scan which showed corporal abscess or gas and recognizing these were emergency findings that required immediate incision and drainage; (6) failing to know the cystoscopy would not treat a corporal abscess and a urethral tear noted during a cystoscopy revealed the "likely seeding point" for the corporal abscess and knowing that leaving plaintiff's Foley catheter in place would "seal pus in his corpora"; (7) failing to inform plaintiff that he had a corporal abscess which needed to be incised and drained; and (8) failing to know the signs, symptoms, and treatment for a periurethral abscess. The expert opined Good's violation of the standard of care caused plaintiff harm, leaving his corporal abscess untreated and "sealed into place" by the Foley catheter and leading to Fournier's gangrene and, ultimately, the necessity of a penectomy.

¶ 29      In his response to the motion, Good contended plaintiff failed to establish sufficient probable cause to justify converting him to a defendant. Good attached the transcript of his discovery deposition in support. He asserted that his role at Unity Point in July 2021 was to

accompany the urologist-physician on hospital rounds. The physician would get the patient's history, examine the patient, and formulate a treatment plan; Good would simply write the chart notes. The chart notes would then be signed by the urologist-physician to confirm agreement with Good's documentation. Good stated he was with Dr. Steiger every time he saw plaintiff during plaintiff's hospitalization at Unity Point. Good's role was that of a "scribe," and Steiger cosigned every note prepared by him. Good contended he made no treatment decisions or diagnoses and he deferred to Dr. Steiger. He asserted he "did not order any tests, prescribe medications, make any differential diagnoses, or make any independent interpretations of imagining studies." Good stated he made no independent interpretation of ultrasound images or films and he was unable to assess the clinical significance of imaging. Good reiterated that he was just a "scribe."

¶ 30 In his deposition, Good also stated he usually saw patients with Dr. Steiger, but he could not say there was never a time the patient was seen without the physician present. He later stated when he saw plaintiff on July 13, 14, 15, and 16, he believed Dr. Steiger was with him in the room. When asked whether he performed the duties of a physician assistant, which were read from the written supervisory agreement and described the relationship between physician assistants and supervising physicians working at Unity Point, he replied, "I was seeing patients." Good acknowledged he did "diagnose, treat, manage acute and chronic health problems," and order laboratory and radiology tests. Good stated he did not perform or interpret tests. He stated he believed his privileges at Unity Point allowed him to see, examine, and diagnose patients independently of a supervising physician.

¶ 31 In reply, plaintiff pointed to evidence to refute Good's contention that his role as a physician assistant at Unity Point was to be a scribe for a supervising physician. Good's

curriculum vitae described his skills to include, *inter alia*, "appreciation and practice of interdisciplinary approach to the medical care of patients," proficiency in performing physical exams in the field of urology, "[c]ompetent in ordering, performing, and interpreting diagnostic studies," and "[s]killed in diagnosing and treating patients suffering from diseases of the urogenital organs and tract." Plaintiff worked pursuant to a supervisory agreement which outlined his relationship with a supervising physician to work together to deliver health care services to patients at Unity Point, including "the diagnosis, treatment and management of acute and chronic health problems, ordering, interpreting and performing laboratory and radiology tests, prescribing medications, including controlled substances, to the extent delegated, receiving and dispensing stock and sample medications, [and] performing other therapeutic or corrective measures as indicated." Plaintiff pointed to numerous entries in his medical chart wherein Good physically examined plaintiff, reviewed his laboratory results, created a patient assessment and care plan, wrote orders for plaintiff's medical care, and consulted with specialists concerning plaintiff's care. Plaintiff also presented evidence to refute Good's assertion that Dr. Steiger was present each time Good saw plaintiff. Good admitted his privileges at Unity Point included allowing him to see, examine, and diagnose patients independently of a supervising physician. He could order radiology tests, including CT scans and ultrasounds. Good admitted plaintiff was his patient and he had no training as a scribe.

¶ 32                           b. Hearing and Trial Court's Ruling

¶ 33          At the February 22, 2024, hearing on plaintiff's motion to convert respondents in discovery, plaintiff argued he was not required to show a high degree of likelihood of success on the merits, evidence necessary to defeat a motion for summary judgment, or establish a *prima facie* case. Plaintiff contended his attorney affidavit, expert report, and proposed amended

pleading presented sufficient evidence to establish probable cause for an action against Good. Plaintiff stated his expert report set forth the standard of care required of Good and established Good breached the standard over multiple days of treatment. He stated Good's contention he was merely a scribe for Dr. Steiger was rebutted by the evidence. Further, plaintiff argued any disputes as to what the standard of care may have been and whether Good's conduct violated that standard are to be decided at another time, after conversion.

¶ 34　　　　　In response, Good's attorney argued Good's deposition proved he was a "mid-level care provider, not a physician, who's treating the patient alongside of Dr. Steiger" or any other physician in the group. Counsel noted plaintiff's expert report did not acknowledge the nature of the relationship between Good and Dr. Steiger—Dr. Steiger made the care plans and determined what procedures or medications would be ordered for plaintiff. Counsel argued, therefore, there was insufficient probable cause to warrant Good's conversion to a defendant.

¶ 35　　　　　In reply, plaintiff noted Dr. Steiger had not yet testified, so some of the representations about the nature of his relationship with Good were "not substantiated at this point." Good testified he was not sure if Dr. Steiger was with him every time he saw plaintiff, and the record showed, at times, Dr. Steiger was in surgery while Good was seeing plaintiff. The scope of the supervisory agreement under which Good worked at Unity Point showed his duties were to provide healthcare services to patients. Plaintiff argued he established Good provided these services to plaintiff and breached the standard of care while doing so; therefore, he should be converted to a defendant.

¶ 36　　　　　The trial court expressed the difficulty it was having regarding converting Good was due to the nature of the physician assistant role. Plaintiff argued a physician assistant has his or her own duty of care as a medical provider and his or her scope of practice outlined what he or

she was obligated to do, whether the supervising physician was in the room or not. Good's counsel responded the expert report claimed Good had an obligation to *inform* Dr. Steiger, not that Good was to perform the care. He argued not only was Dr. Steiger "calling the shots," he was present each time Good saw plaintiff. Because of this, Good's counsel argued, there was nothing Good needed to inform Dr. Steiger about. Good's attorney stated, "We could argue that the [physician assistant] should be doing something differently, and I'm sure there are circumstances where the [physician assistant] does take on a bigger role than this [physician assistant] did here," but that is not how this physician group operated. Plaintiff replied causation cannot be negated by "saying essentially, well, my attending or a different doctor would have known so anything I did wrong didn't matter."

¶ 37        After further lengthy discourse between the attorneys and the trial court, the court denied plaintiff's motion to convert Good, stating its job was to "make a determination as to whether or not it would be fair" for Good to have to continue to respond or be a part of this litigation. The court concluded it did not find "enough here to burden him with that based upon what's been provided to the Court for review." In its written decision, the court concluded there was insufficient probable cause to convert Good to a defendant and terminated him as a respondent in discovery.

¶ 38                    2. *Specialists Respondents*

¶ 39                    a. Motion to Convert Dr. Kim and Specialists

¶ 40        In support of plaintiff's motion for conversion of Dr. Kim from a respondent in discovery to a defendant, plaintiff attached a proposed third amended complaint. In count 19, plaintiff alleged Dr. Kim was a radiologist who worked for Specialists, which contracted with Unity Point to provide diagnostic radiology services for Unity Point's patients. Dr. Kim treated

plaintiff on July 11, 2021, when he interpreted the CT scan of plaintiff's abdomen and pelvis. Although Dr. Kim observed gas present in the corpus cavernosum of plaintiff's penis during his review of the CT scan images, he did not mention the finding in his report and did not communicate the finding of gas in the corpus cavernosum to any medical provider or plaintiff. Plaintiff alleged Dr. Kim knew the infection of the penis soft tissue could cause the finding of gas in the corpus cavernosum which he observed on plaintiff's CT scan. Plaintiff alleged Dr. Kim was negligent in numerous ways, including failure to document in the CT scan report plaintiff had gas in his penis soft tissue, inform other providers of this finding, recognize this as an emergency finding, and use the requisite skill, knowledge, and care of a reasonably competent radiologist.

¶ 41　　　　The expert report referenced in plaintiff's counsel's section 2-622 affidavit was from a board certified diagnostic radiologist who stated he was familiar with the standard of care applicable to Dr. Kim and had reviewed plaintiff's medical records. The expert stated Dr. Kim interpreted the CT scan that was performed on plaintiff after he arrived at the hospital on July 11, 2021. The expert stated the CT scan "study demonstrated abnormal air" in plaintiff's penis, which Dr. Kim confirmed in his interrogatory responses, but Dr. Kim did not mention these "critical finding[s]" in his report. Dr. Kim did not have any conversations with any medical providers at Unity Point between July 11 and 22, 2021, concerning plaintiff. The expert stated the "finding of air within the penis constituted an emergency finding that if unacted upon could potentially result in severe harm" to plaintiff, including a penectomy or death. He opined the standard of care required Dr. Kim to document the emergency finding of air within the penis in his CT scan report, immediately personally communicate these findings to Dr. Begum, the

provider who ordered the test, confirm the urgent nature of the finding with Dr. Bergum, and document this communication within the medical records.

¶ 42 The expert opined Dr. Kim violated the standard of care by failing to take any of those actions. He contended his opinion was confirmed by (1) the July 14 CT scan which showed "significant and abnormal increased expansion of gas in the penile corpora cavernosa and/or an abscess in this area," (2) the July 20 MRI which showed necrotic changes within the penile corpora, and (3) the July 24 penectomy operative report and surgical pathology report which showed plaintiff's penis was amputated due to necrosis. The expert opined Dr. Kim's breach of the standard of care resulted in a delay in the diagnosis and treatment of plaintiff's infection and led to his penectomy.

¶ 43 b. Motion to Convert Dr. Neri and Specialists

¶ 44 In support of plaintiff's motion for conversion of Dr. Neri from a respondent in discovery to a defendant, plaintiff alleged in count 21 of his proposed third amended complaint that Dr. Neri was a radiologist who worked for Specialists, which contracted with Unity Point to provide diagnostic radiology services for Unity Point's patients. Dr. Neri treated plaintiff on July 14, 2021, when he interpreted the CT scan of plaintiff's abdomen and pelvis. Plaintiff referred to his medical records, where Dr. Neri found "fluid and gas are present in the corpora cavernosa dorsal to the proximal/bulbous portion of the penile urethra," and his impression stated, "fluid and gas collection in the proximal corporal cavernosa concerning for necrotizing fasciitis." Plaintiff alleged Dr. Neri did not "correlate" the July 11 and July 14 CT scans and his report of the July 14 CT scan did not document it showed an expansion of gas within the corpus cavernosum of plaintiff's penis when compared to the July 11 CT scan. Plaintiff alleged Dr. Neri did not personally communicate the findings of gas in the corpus cavernosum to any medical

- 17 -

provider or plaintiff. Dr. Neri was alleged to be negligent in numerous ways, including failing to compare the July 14 and July 11 CT scans, document the comparison, and failing to communicate the significant expansion of gas in the soft tissue of plaintiff's penis, personally communicate the CT scan results to plaintiff or any healthcare provider and confirm they understood the significance of the finding, understand the finding was an emergency, and failing to use the requisite skill, knowledge, and care of a reasonably competent radiologist.

¶ 45     The physician report referenced in plaintiff's counsel's section 2-622 affidavit was from a board certified radiologist who stated he was familiar with the standards of care applicable to Dr. Neri and had reviewed plaintiff's medical records. The expert stated Dr. Neri reviewed plaintiff's July 14 CT scan and signed his report at 7:18 p.m., finding the fluid and gas collection in the proximal corpora cavernosa, which was concerning for necrotizing fasciitis. Dr. Neri stated in his report that he compared the July 11 CT scan with the July 14 scan but, according to his interrogatory answers, he did not comment on the expansion of gas within the corpora cavernosa between those exams and he did not recall any conversations with medical providers concerning his findings. The expert stated gas does not exist naturally within the corpora cavernosa, and such a finding constitutes a medical emergency. The expert stated that the standard of care required Dr. Neri to make a "personal, non-routine communication" to Gillespie, the provider who ordered the test, of the following: the finding of gas on the July 14 CT scan to Gillespie; the comparison of the July 11 and July 14 CT scans showed a significant expansion of the gas; and the findings constituted a medical emergency. The expert also stated the standard of care required Dr. Neri to confirm Gillespie understood the nature of the finding and was going to act on it. He contended the standard of care required Dr. Neri to document the

comparison of the two CT scans and his required follow-up communications of this medical emergency with the provider who ordered the test.

¶ 46     The expert opined Dr. Neri violated the standard of care by not taking any of the aforementioned actions. He opined further if Dr. Neri attributed the July 14 CT scan findings of gas in the corpora cavernosa to being the result of trauma rather than gas forming bacteria or an abscess, this would be contrary to plaintiff's medical records and a further violation of the standard of care required of Dr. Neri for failing to act with the knowledge of a reasonable, competent, and skilled radiologist. The expert stated Dr. Neri's breach of the standard of care caused plaintiff harm and delayed his treatment, resulting in plaintiff's penectomy.

¶ 47                          c. Response of Specialists Respondents

¶ 48     On January 12, 2024, Specialist respondents collectively responded to plaintiff's motion to convert them to defendants. Specialists respondents argued plaintiff failed to meet the probable cause standard to warrant conversion. Specialists respondents contended plaintiff could not show an honest and strong suspicion that their purported negligence was a proximate cause of his injury. In support, they contended all the evidence pointed to the fact plaintiff's treating providers knew of the concern of necrotizing fasciitis before, or shortly after, Dr. Kim's and Dr. Neri's interpretations of the CT scans. Further, they argued, "[o]nce it was identified as a concern, subsequent interventions by Plaintiff's treating providers revealed no anomalies consistent with necrotizing fasciitis. Thus, any conclusion that the providers would have acted differently, had the alleged negligent acts of Dr. Kim or Dr. Neri not occurred is disingenuous." Specialists respondents argued further, plaintiff's expert reports were insufficient because they were not based on a review of plaintiff's complete medical records and were conclusory because

they failed to specify the adverse effects suffered by plaintiff due to the conduct of Dr. Kim or Dr. Neri.

¶ 49　　　Specialists respondents attached the following exhibits to their response to the motion to convert: exhibit A: plaintiff's third amended complaint and accompanying affidavits and medical expert reports; exhibit B: Wigginton's deposition transcript; exhibit C: Dr. Neri's deposition transcript; exhibit D: 79 pages of plaintiff's medical records; and exhibit E: Dr. Kim's answers to interrogatories from plaintiff.

¶ 50　　　　　　　　　　　　d. Plaintiff's Reply

¶ 51　　　On February 6, 2024, plaintiff filed a reply brief to Specialists respondents objection to conversion and attached the following: (1) amended section 2-622 affidavits and expert reports regarding Dr. Kim and Dr. Neri to support his motion, (2) a portion of plaintiff's medical chart, (3) the deposition transcripts of Dr. Wigginton and Dr. Neri, (4) the interrogatory responses of Dr. Kim, Dr. Neri, and Dr. Wigginton, and (5) the original motion and documents attached thereto (the original section 2-622 affidavits, original expert reports, and proposed third amended complaint).

¶ 52　　　　　　e. Specialists Respondents' Motion to Strike New Evidence

¶ 53　　　At the hearing on February 22, 2024, Specialists respondents made an oral motion to strike the new evidence that was presented in plaintiff's reply. Specialists respondents argued it was improper for plaintiff to amend his expert reports and present new evidence, without leave of the court, in an effort to correct the deficiencies they had pointed out in their response to argue conversion was not warranted.

¶ 54　　　In response to the oral motion, plaintiff stated the conversion deadline was extended as to some but not all respondents in discovery and "gave an extremely compressed

tight timeline" to obtain the deposition transcripts of as many witnesses as he could. He acknowledged he was unable to get the radiology transcripts (referring to deposition transcripts of Dr. Wiggington and Dr. Neri) to his experts until after the motion was on file. Counsel argued the expert's opinions did not substantially change, but he "felt incumbent upon it given that the Court would take evidence today to bring those forward and show them to you, Judge, and I did everything as quickly as I possibly could." He argued further, citing *Steinberg v. Dunseth*, 276 Ill. App. 3d 1038 (1995), leave to amend any perceived deficiencies with section 2-622 reports should be freely granted in medical malpractice cases because a plaintiff should be afforded every reasonable opportunity to establish his case. Plaintiff's counsel apologized for not filing a motion for leave to amend the motion and expert reports, again citing his busy schedule and the tight time frame, and asked the court to consider the new evidence he previously presented.

¶ 55    When discussing the amendment to the reports with the trial court, counsel stated, "[I]t just is more expansive. It's a bit longer, Judge. That's what I would say." Plaintiff's counsel stated, "[T]heir opinions about the breaches and deviations from the standard of care are the same, Judge. They didn't add any new criticisms—or I don't think anything substantively changed." The court granted the motion to strike, reasoning, "[B]ased on [plaintiff's counsel's] representation of the amendment, it didn't provide any additional findings, any additional opinions so I'm not quite sure how you would be harmed" by the court striking it.

¶ 56    In its written order dated March 6, 2024, the trial court granted Specialists respondents' oral motion to strike "the new evidence presented in Plaintiff's Reply for the reasons stated on the record." Although not expressly addressed at the hearing or in the written order, "the new evidence" stricken presumably included not just the amended expert reports, but also the other documents not already made part of the record by respondents in discovery.

¶ 57          f. Hearing and Trial Court's Ruling on Plaintiff's Motion to Convert

¶ 58          At the February 22, 2024, hearing on plaintiff's motion to convert Specialists respondents, plaintiff argued Dr. Kim admitted he observed gas within the soft tissue of plaintiff's penis when he reviewed plaintiff's July 11 CT scan and he did not state this finding in his report or communicate it to any of plaintiff's healthcare providers. He argued his expert report established that "[g]as in the soft tissue of a diabetic patient with suprapubic pain" is Fournier's gangrene, and Dr. Kim had an obligation to document this as "an urgent emergency finding that needed to be personally communicated to the provider that ordered the test." He argued he established probable cause with respect to Dr. Kim. Similarly, he argued he established probable cause as to Dr. Neri because the records showed Dr. Neri failed to correlate the July 11 and July 14 CT scans and recognize the "dramatic expansion" of the gas shown in plaintiff's penis and to conclude it "could not be caused by anything other than an ongoing infectious process in the penis soft tissue." He argued if Dr. Neri had complied with the standard of care, it likely "would have led reasonably competent medical providers to understand that they could be looking at nothing else other than Fournier's gangrene." and plaintiff would have received proper and timely treatment.

¶ 59          In response, counsel for Specialists respondents argued plaintiff seemed to suggest that a motion to convert is "simply a check the box, hey, if I have got a [section] 2-622 report and I file an amended complaint, that's good enough." Counsel contended the trial court's role is that of a "gatekeeper" and plaintiff had the burden of establishing probable cause by proving an "honest and strong suspicion of proximate cause." Counsel contended based on the evidence before the court, "[I]t is abundantly clear that plaintiff can never prove proximate cause."

¶ 60        With respect to Dr. Neri, counsel contended he read the July 14 CT scan and made a radiology diagnosis of "concern for necrotizing fasciitis." A radiologist is not a clinician who can diagnose Fournier's gangrene or necrotizing fasciitis. In fact, plaintiff admitted numerous times in his complaint that Dr. Neri "correctly and accurately interpreted the CT scan on July 14th." Counsel contended it was disingenuous to claim Dr. Neri was negligent for not communicating the CT scan results to the clinical team because medical records proved they were already "completely aware of the concern for necrotizing fasciitis." Counsel argued, therefore, there could be no proximate cause with respect to Dr. Neri, so plaintiff could not meet the standard to convert him to a defendant.

¶ 61        With respect to Dr. Kim, counsel argued Dr. Kim explained his reason for not mentioning the "one small tiny bubble of air" on the July 11 CT scan was because he assumed it was from the insertion of a Foley catheter earlier that day. Counsel contended anything Dr. Kim would have done in terms of informing the clinical team would not have mattered based upon how the clinical team responded to the July 14 CT scan. As plaintiff acknowledged, the gas seen on the CT scan images on July 14 was "grossly dramatically different"; still, the entire clinical team, having reviewed the CT scan results, dismissed concerns for necrotizing fasciitis. Counsel argued, therefore, the clinical team certainly "wouldn't have done anything different with Dr. Kim's report three days prior when he had just one small tiny air bubble." Counsel concluded plaintiff had not established probable cause as to Specialists respondents and the motion to convert should be denied.

¶ 62        After further lengthy discussion among the attorneys and the trial court regarding causation, the court found, based on what was presented, "the communication was made which creates issues regarding proximate cause" and "even though we're only determining whether or

not there's probable cause, if there's proximate cause, the Court finds it to be lacking and will deny the motion to convert with regard to Drs. Neri and Kim." The court added, finding no probable cause as to Dr. Kim or Dr. Neri, Specialists could not be considered vicariously liable. In the court's written decision filed on March 12, 2024, it concluded probable cause did not exist to convert Specialists respondents to defendants and terminated them as respondents in discovery.

¶ 63        D. Additional Proceedings Following the Trial Court's Denial of Conversion

¶ 64        On March 12, 2024, plaintiff filed a motion for reconsideration of the trial court's decision to deny conversion of respondents in discovery, arguing the court "misapplied" the standard set forth in *Cleeton*. Before any action was taken regarding this motion, plaintiff filed a motion to supplement his motion for reconsideration, asking the court to consider new evidence. Both motions were briefed and ruled on after separate hearings.

¶ 65        1. *Plaintiff's Motion to Supplement His Motion for Reconsideration*

¶ 66        On April 10, 2024, plaintiff filed a motion to supplement his motion for reconsideration, asking the trial court to consider the depositions of Gillespie (taken on March 22, 2024) and Aaron McLean, another physician assistant who treated plaintiff (taken on April 5, 2024). Plaintiff argued this was newly discovered evidence that was unavailable to him during the hearing on the motion to convert and included facts establishing probable cause to convert respondents in discovery to defendants.

¶ 67        Plaintiff stated Gillespie, a physician assistant specializing in infectious disease who treated plaintiff at Unity Point, testified Dr. Kim's report did not indicate gas in plaintiff's penile soft tissue and she would have wanted to know about this abnormal finding, as it could indicate an abscess or gas-forming bacterial infection. Gillespie also stated Good was one of

plaintiff's medical providers; she was not aware of any medical scribes at Unity Point; she did not remember Good telling her he was a scribe; and if she thought Good was just a scribe, she would not have called him about plaintiff's condition. McLean, a physician assistant for the hospitalist physicians at Unity Point, testified no medical provider informed him the July 11 CT scan showed gas in plaintiff's penile soft tissue. McLean stated the finding of gas or an abscess is an abnormal finding he would want to know about and the only two things he knew to cause this condition were surgery or infection. McLean also testified had he known the July 11 CT scan showed gas in plaintiff's penile soft tissue, he would have communicated this information to the urology and infectious disease departments. Plaintiff argues this newly discovered evidence establishes Dr. Kim's failure to document and communicate that the July 11, 2021, CT scan showed gas in plaintiff's penile soft tissue proximately caused harm to plaintiff and created a question of fact as to whether Good was only a scribe and not a medical provider for plaintiff.

¶ 68　　　　　On May 17, 2024, Specialists respondents filed a response to plaintiff's motion to supplement his motion for reconsideration. They argued the evidence plaintiff sought to add for consideration was obtained after the conversion deadline of January 8, 2024, and after the hearing and decision on the issue of conversion, which occurred on February 22, 2024. As such, it should not be considered. Further, they argued plaintiff's request was an abuse of the motion to reconsider process because he was seeking a "second chance" to make his case after the fact with evidence he failed to procure within the time frame required by the statute. Good filed no written response to this motion, but at the subsequent hearing, his counsel adopted the arguments of counsel for Specialists respondents.

¶ 69　　　　　On May 30, 2024, a hearing was held on plaintiff's motion to supplement his motion for reconsideration. After hearing extensive argument, the trial court stated it was

- 25 -

undisputed the evidence was secured after the conversion deadline, after the probable cause hearing, and after the termination of Specialists respondents as a result of that hearing. The court concluded:

"I think it's also clear that the statute does set deadlines and it does set a deadline for the time frame for which [respondents in discovery] would be converted, so I don't think that it makes sense to rule on this matter in such a way that it negates a statutory deadline."

The trial court noted there was no conduct by these respondents in discovery which would cause it to negate the statutory deadline. Thus, plaintiff's motion to supplement his motion to reconsider was denied.

¶ 70    2. *Plaintiff's Motion for Reconsideration of the Decision to Deny Conversion*

¶ 71    In his motion for reconsideration of the decision to deny conversion of respondents in discovery, plaintiff argued probable cause is established when a plaintiff presents a proposed amended pleading alleging the negligence of a respondent in discovery, a section 2-622 attorney affidavit, and an expert report supporting the allegations. He argued the *Cleeton* court determined that once this evidence is presented, the probable cause analysis ends, and conversion is required.

¶ 72    In their response, Specialists respondents argued the trial court properly applied the standard set forth in *Cleeton*. Specialists respondents characterized plaintiff's claim that the filing of an expert report is sufficient to establish probable cause to convert as "misguided" because if the physician's report is insufficient or the court has the benefit of reviewing other documentary evidence, the court may conclude an ordinary and prudent person would not have an honest and strong suspicion that the respondent in discovery is liable. Specialists respondents

argued the court made the correct determination based on the evidence in this case. Good made similar arguments in his response, contending the court properly concluded there was insufficient evidence to establish probable cause to warrant conversion.

¶ 73        After a hearing on August 1, 2024, the trial court denied plaintiff's motion to reconsider the decision to deny conversion. In its written decision issued on August 7, 2024, the court deemed it a final order with respect to these respondents in discovery and found there to be no just reason for delaying enforcement or appeal of the order pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016).

¶ 74        This appeal followed.

¶ 75                          II. ANALYSIS

¶ 76        Plaintiff argues the trial court erred in (1) denying his motion to convert Good and Specialists respondents to defendants under section 2-402 of the Code (735 ILCS 5/2-402 (West 2022)), (2) striking and refusing to consider plaintiff's amended section 2-622 expert reports before ruling on the motion to convert Specialists respondents to defendants, (3) denying plaintiff's motion to supplement his motion for reconsideration with a new basis and new evidence, and (4) denying his motion for reconsideration.

¶ 77                A. Motion to Convert Respondents in Discovery

¶ 78        Section 2-402 of the Code is a statutory procedure whereby a plaintiff in a civil action can designate individuals or entities as respondents in discovery in his or her pleadings. See *id.* These individuals or entities are "believed by the plaintiff to have information essential to the determination of who should properly be named as defendants in the action" *Id.* As the name indicates, respondents in discovery are required to respond to discovery by the plaintiff just as the defendants, and they "may, on motion of the plaintiff, be added as defendants if the evidence

discloses the existence of probable cause for such action." *Id.* The purpose of section 2-402 is "to provide plaintiff's attorneys with a means of filing medical malpractice suits without naming everyone in sight as a defendant" because doing so is believed to contribute to "the spiraling cost of medical malpractice insurance." *Clark v. Brokaw Hospital*, 126 Ill. App. 3d 779, 783 (1984). However, as the court noted in *Ingle v. Hospital Sisters Health System*, 141 Ill. App. 3d 1057, 1062 (1986), this purpose

> "will not be served if a high degree of likelihood of success is necessary to be shown before such respondents can be named defendants. If that is required, plaintiffs will continue the practice of naming as defendants most of those who have provided medical services to them at or about the time of the alleged injury."

Therefore, courts have consistently held the standard to establish probable cause under the Code to be low. See *Cleeton*, 2023 IL 128651, ¶ 32.

¶ 79            On review, a trial court's decision regarding whether to convert a respondent in discovery to a defendant is entitled to deference only when the court heard testimony and made determinations about conflicting evidence. *McGee v. Heimburger*, 287 Ill. App. 3d 242, 248 (1997). Under circumstances where the trial court only considered documentary evidence, as in this case, review is *de novo*. *Id.*

¶ 80                                    1. *Probable Cause*

¶ 81            We first address the parties' conflicting interpretations of our supreme court's decision in *Cleeton* regarding the level and type of evidence required to support conversion of a respondent in discovery. In *Cleeton*, the supreme court examined probable cause under section 2-402 and determined a plaintiff must present sufficient evidence that "would cause a person of ordinary caution and prudence to develop an honest and strong suspicion that the purported

negligence of the respondent was a proximate cause of plaintiff's injuries." *Cleeton*, 2023 IL 128651, ¶ 44. The court noted:

> "Inherent in the legislative history, as evidenced by the discussions among the legislators and language of the statute itself, was the principle that the plaintiff would not have to prove his or her case at the discovery stage. Instead, the threshold the plaintiff must meet is to present evidence that would establish a reasonable probability that the respondent in discovery could be liable for the plaintiff''s injury. At the discovery stage, the threshold is sufficiently low to allow the plaintiff to convert a respondent in discovery to a defendant. Certainly, one of the underlying purposes of the statute was to protect medical providers. However, there is no indication in the legislative history that the legislators intended to make it more difficult for a plaintiff to name a defendant or convert a respondent in discovery to a defendant." *Id.* ¶ 41.

The court explained the legislature never intended to add burdens to plaintiffs to meet a higher threshold than would be required had they initially sued defendants without first utilizing the respondent in discovery process. *Id.* ¶ 42.

¶ 82    To state it succinctly, the court in *Cleeton* determined the amount of evidence necessary to establish probable cause under the Code is *low* and should be *liberally construed* to the end that controversies may be determined according to the substantive rights of the parties. *Id.* ¶ 35. The court cited with approval a number of cases wherein the type of evidence presented varied but, in each case, was deemed sufficient to establish probable cause under the Code. See *Moscardini v. Neurosurg, S.C.*, 269 Ill. App. 3d 329, 336 (1994) (finding a section 2-622 affidavit and letter from a healthcare professional based on the information obtained during the

statutory discovery period was sufficient to satisfy the probable cause requirement); see also

*Jackson-Baker v. Immesoete*, 337 Ill. App. 3d 1090, 1095 (2003) (holding that requiring a

plaintiff to comply with section 2-622 to establish probable cause to convert a respondent in

discovery to a defendant would be an unnecessary obstacle imposed on a plaintiff); *Williams v.

Medenica*, 275 Ill. App. 3d 269, 273-74 (1995) (finding the affidavit of a physician, even if not

as "precise and skillfully drafted as it might have been," was sufficient to satisfy the probable

cause standard under the Code); *Ingle*, 141 Ill. App. 3d at 1062-65 (finding affidavits, X-rays,

and discovery depositions of the respondents in discovery in a medical malpractice case were

sufficient to establish probable cause to convert the respondents in discovery) . We further note

courts have held section 2-402 does not require a plaintiff to conduct discovery with respondents

in discovery before seeking leave to convert them to defendants. *Torley v. Foster G. McGaw

Hospital*, 116 Ill. App. 3d 19, 23 (1983) (holding a plaintiff must seek leave of court to convert a

respondent in discovery, but also finding no reason to "engraft" the requirement that the plaintiff

engage in discovery before doing so "where the legislature itself has not done so"); *Long v.

Mathew*, 336 Ill. App. 3d 595, 602 (2003) (finding the legislative history of section 2-402 does

not support finding there to be a discovery requirement imposed on a plaintiff before seeking

conversion of a respondent in discovery).

¶ 83        Furthermore, what is sufficient to establish probable cause is also dependent upon

the nature and complexity of the case at hand. *Medjesky v. Cole*, 276 Ill. App. 3d 1061, 1064

(1995). In medical malpractice cases, the plaintiff has the burden of pleading and proving the

following:

> " 'the proper standard of care against which the defendant physician's conduct is
>
> measured; an unskilled or negligent failure to comply with the applicable

standard; and a resulting injury proximately caused by the physician's want of skill or care. [Citations.] Unless the physician's negligence is so grossly apparent or the treatment so common as to be within the everyday knowledge of a layperson, expert medical testimony is required to establish the standard of care and the defendant physician's deviation from that standard.' " *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 112 (2004) (quoting *Purtill v. Hess*, 111 Ill. 2d 229, 241-42 (1986)).

¶ 84 The decision in *Cleeton* did not identify the types of evidence necessary to establish probable cause to convert a defendant. Indeed, the court illustrated numerous ways in which it was accomplished with documentary evidence and acknowledged further it also may be accomplished by holding an evidentiary hearing. Still, it is misleading to suggest *Cleeton* held that filing a proposed pleading and section 2-622 affidavit and an accompanying expert report *per se* establishes probable cause under the Code. Rather, the *Cleeton* decision established those documents may be sufficient to establish probable cause if they present evidence that "would cause a person of ordinary caution and prudence to develop an honest and strong suspicion that the purported negligence of the respondent was a proximate cause of plaintiff's injuries." *Cleeton*, 2023 IL 128651, ¶ 44. In its role as "gatekeeper—to simply assess whether it is fair to let the plaintiff proceed further against the respondents in discovery and subject them to the fact-finding process" (*McGee*, 287 Ill. App. 3d at 248-49), the trial court is obliged to consider all the evidence presented, including evidence relied upon by the respondents in discovery in opposition to conversion.

¶ 85    It is within this context that we must determine whether the evidence presented to the trial court disclosed the existence of probable cause for an action against Good and Specialists respondents.

¶ 86                                  2. *Jeremy Good*

¶ 87    Plaintiff argues he presented sufficient evidence to warrant the conversion of Good to a defendant. In support, plaintiff contends the documents he presented, including the proposed amended complaint, the section 2-622 attorney affidavit, and the expert report, established probable cause that Good breached the standard of care by failing to act with the required knowledge of a urology physician assistant in caring for plaintiff and that breach resulted in a delay in plaintiff's diagnosis and treatment and ultimately led to the amputation of his penis.

¶ 88    In response, Good argues the evidence presented to the trial court, most notably his own deposition transcript, refuted any claim that there was a causal connection between his involvement with the care provided by Dr. Steiger and plaintiff's injuries. Good argues he demonstrated his role was to go on hospital rounds with urology physicians and act as a scribe for those providers. He deferred to Dr. Steiger for any change in the plan of care for plaintiff, did not perform or order laboratory or radiology tests or medications for plaintiff, and made "no independent interpretations of ultrasound images or films as he would be unable to assess the clinical significance of this imaging." Good argued, "[T]here is no case law in Illinois that supports the situation that existed here: where the alleged deviation from the standard of care was being addressed by a physician who had more expertise on the diagnosis and treatment issues."

¶ 89        Our *de novo* review of the record reveals plaintiff established probable cause to bring a claim of medical negligence against Good. In support of his motion to convert, plaintiff filed a proposed amended complaint wherein he alleged, in count 11, Good had a duty of care to plaintiff as a urology physician assistant who was treating him. Although he was working under the supervision of other physicians at Unity Point, Good acknowledged, and the medical records confirmed, plaintiff was his patient and he saw and provided care for him on four consecutive days during his stay at Unity Point.

¶ 90        In support of his allegations of negligence against Good, plaintiff included a section 2-622 attorney affidavit and an expert report. In the report, the expert stated he was a board certified and licensed urologist familiar with the standard of care applicable to Good in providing treatment to plaintiff, and he opined Good failed to comply with that standard in numerous ways. He opined Good was obligated to review plaintiff's medical radiology exam results on each of the four consecutive days he treated plaintiff, recognize the corporal abscess and/or gas present, possess the requisite knowledge as a urology physician assistant to recognize this was an emergency finding, inform his supervising physician, Dr. Steiger, and recommend the appropriate treatment. He opined further Good violated the standard of care by failing to understand the cystoscopy performed by Dr. Steiger did not provide a view of the corpora cavernosa of plaintiff's penis and the urethral tear noted during that procedure "revealed the likely seeding point whereby pus infiltrated the corpora [cavernosa] and caused the known abscess." The standard of care required Good to know that leaving plaintiff's Foley catheter in place to " 'bridge' [the] urethral tear was improper, as the catheter effectively acted as a sealant holding the pus in place." The expert opined Good's failures contributed to the delay in plaintiff's diagnosis and treatment, which led to the necrosis of plaintiff's penis and necessity for

its eventual amputation.

¶ 91        Good claims he deferred to Dr. Steiger regarding all medical treatment of plaintiff and his role was that of a scribe for Dr. Steiger; therefore, his care could not have been the factual or legal cause of plaintiff's injury. However, the record belies these assertions. Plaintiff's medical records confirmed that Good physically examined plaintiff, reviewed his medical chart, reviewed his laboratory test results, assessed plaintiff's condition, updated plaintiff's care plan, wrote orders for plaintiff's medical care, and consulted with specialists concerning plaintiff's care. The scope of the supervisory agreement under which Good worked at Unity Point explained his duties were to provide health care services to patients, which included diagnosis, treatment, management of acute and chronic conditions, ordering, interpreting, and performing laboratory and radiology tests, and prescribing medications. During his deposition, Good acknowledged he did "diagnose, treat, [and] manage acute and chronic health problems" and order laboratory and radiology tests, but he did not perform or interpret those tests. He stated he believed his privileges at Unity Point allowed him to see, examine, and diagnose patients independently of a supervising physician. Plaintiff's expert opined that had Good abided by the standard of care required of him as a urology physician assistant, he would have recognized plaintiff's condition as an emergency, informed his supervising physician, and advocated for the proper care. If this had occurred during the crucial time period when Good treated plaintiff, the delay in plaintiff's treatment and ultimate outcome may have been avoided. At the respondent-in-discovery stage, the trial court does not determine the factual question of liability or whether Good is guilty of medical negligence. As stated in *Cleeton*, our task is to determine whether plaintiff presented sufficient evidence that "would cause a person of ordinary caution and prudence to develop an honest and strong suspicion that the purported negligence of the

respondent was a proximate cause of plaintiff's injuries." *Cleeton*, 2023 IL 128651, ¶ 44. We conclude the record established plaintiff had done so in this case with respect to Good, and we reverse the trial court's decision to deny the conversion of Good to a defendant.

¶ 92                                    3. Specialists *Respondents*

¶ 93                                    a. Dr. Kim and Specialists

¶ 94          Plaintiff argues the evidence before the trial court established probable cause to justify converting Dr. Kim, the radiologist who interpreted plaintiff's July 11 CT scan, to a defendant in this case as well. In support, he argues the section 2-622 attorney affidavit and the accompanying expert report with respect to Dr. Kim stated the standard of care required Dr. Kim to document the finding of gas in the corpus cavernosum of plaintiff's penis in his July 11 CT scan report as an emergency finding, "immediately personally communicate" the finding to the provider who ordered the test, confirm the urgency of the finding with the provider, and document this communication in plaintiff's medical records. By failing to do so, Dr. Kim contributed to the delay in diagnosing and treating Fournier's gangrene, which resulted in the amputation of plaintiff's penis. In response, Dr. Kim argues plaintiff has failed to demonstrate an honest and strong suspicion that any alleged negligence attributable to him was a proximate cause of plaintiff's injuries.

¶ 95          Our review of the record reveals the trial court was correct in its conclusion that plaintiff failed to establish probable cause to convert Dr. Kim from a respondent in discovery to a defendant. Dr. Kim's treatment of plaintiff was exclusively to interpret one imaging study— plaintiff's July 11 CT scan. The scan was ordered after plaintiff arrived at Unity Point for a severe UTI stemming from having a chronic Foley catheter in place. The order for the scan was indicated for abdominal pain and fever. Dr. Kim's CT scan report was consistent with plaintiff's

condition, reporting "bladder stones versus calcifications" present and "questionable thickening of the bladder which may reflect chronic cystitis [inflammation of the bladder often caused by bacterial infections], however acute or chronic process is not definitely excluded."

¶ 96　　　In his answers to interrogatories, Dr. Kim acknowledged observing "trace amounts of what appeared to be air" present in the corpus cavernosum of plaintiff's penis during his review of the July 11 CT scan. However, Dr. Kim explained further that he did not include this finding in his written report or otherwise communicate it to plaintiff's healthcare providers because he attributed it to the recent insertion of a new Foley catheter. Plaintiff's medical records confirm his Foley catheter was replaced upon arrival at Unity Point and before the CT scan. During her discovery deposition, Dr. Wigginton testified she would not consider the finding of gas in the soft tissue structure of plaintiff's penis an "urgent" finding in the July 11 CT scan because there were "very small foci of gas, and it could be from a number of findings and could be incidental." Dr. Wigginton stated the potential sources for the gas seen on the July 11 CT scan could have been an injury from the placement of a Foley catheter, infection, recent surgery, injection, or other trauma. She testified if she had interpreted the July 11 CT scan and had thought the gas was from a traumatic Foley catheter placement, she may not have included it in a report, but if she thought it might be due to a Foley catheter placement or potentially an infection, she would have. Either way, Dr. Wigginton stated she would not have called the ordering physician about the results because it is not standard practice to "call on every single finding we see all day unless it is felt to be a very urgent finding."

¶ 97　　　Over the following three days, plaintiff was examined by a number of providers, including at least three urologists, all of whom reviewed plaintiff's laboratory results, physical condition, and Dr. Kim's CT scan report, and none of whom mentioned concerns regarding the

condition of plaintiff's penis. Their care was focused on treating plaintiff's UTI and a plan for replacing his Foley catheter with a suprapubic catheter once his infection was resolved. It was not until July 14, 2021, that concern for necrotizing fasciitis was raised and was recorded in plaintiff's medical records after additional imaging studies were completed that day. Specifically, Dr. Wigginton interpreted an ultrasound that revealed "concern for gas and necrotizing fasciitis with possible involvement of the corpus cavernosum." This was confirmed by Dr. Neri's review of a follow up CT scan that evening which showed "fluid and gas collection in the proximal corpora cavernosa concerning for necrotizing fasciitis." Yet, despite these new findings and the specific concerns, plaintiff's clinical team dismissed any concerns for necrotizing fasciitis or Fournier's gangrene and continued to treat plaintiff's UTI. Dr. Kim contends if the concerns regarding necrotizing fasciitis raised on July 14 did not lead to a correct diagnosis by the clinical team as plaintiff alleges in his complaint, then any purported negligence by Dr. Kim in interpreting the July 11 CT scan (by not documenting the air observed in the soft tissue of plaintiff's penis) could not have been a proximate cause of any of plaintiff's injuries. Utilizing the standard set forth in *Cleeton*, we agree—no person of ordinary caution and prudence would develop an honest and strong suspicion that Dr. Kim's purported negligence was a proximate cause of plaintiff's injuries. No act or omission by Dr. Kim caused or contributed to the delay in plaintiff's diagnosis or treatment for Fornier's gangrene, which resulted in the amputation of his penis. Therefore, the trial court's decision to deny plaintiff's motion to convert Dr. Kim and Specialists, under a theory of vicarious liability, from respondents in discovery to defendants is affirmed.

¶ 98                                b. Dr. Neri and Specialists

¶ 99 Plaintiff also argues he established probable cause to convert Dr. Neri, the radiologist who interpreted plaintiff's July 14 CT scan, to a defendant. In support, plaintiff contends the expert report regarding Dr. Neri's conduct established the standard of care required him to correlate the two CT scans (the July 14 CT scan he was asked to review and the July 11 CT scan previously interpreted by Dr. Kim) to observe that the gas in the soft tissue of plaintiff's penis "increased dramatically" and understand this increase could only be caused by a growing abscess or Fournier's gangrene. Plaintiff contends although Dr. Neri's report indicated his findings were concerning for necrotizing fasciitis, he violated the standard of care by not acting on these findings as a medical emergency, personally communicating these findings to the healthcare provider who ordered the test, and confirming that provider understood the emergency nature and was going to act upon it. However, we conclude plaintiff's claim against Dr. Neri fails because the evidence does not establish an honest and strong suspicion that Dr. Neri's acts or omissions were a proximate cause of plaintiff's injury.

¶ 100 Plaintiff has failed to establish any of Dr. Neri's purported omissions regarding his written report resulted in any harm to plaintiff. Most notably, plaintiff admitted numerous times in his complaint Dr. Neri "correctly and accurately" interpreted the July 14 CT scan. Dr. Neri's CT scan report independently confirmed Dr. Wigginton's earlier ultrasound findings, indicating concern for necrotizing fasciitis in plaintiff's penis. Plaintiff's expert acknowledged Dr. Neri reported he compared the July 11 and 14 CT scans in performing his analysis. Dr. Neri, himself, confirmed this in his deposition, though he did not recall exactly which images he reviewed from the July 11 CT scan. Dr. Neri acknowledged he did not include a written comparison in finalizing his report, and he explained it was not necessary to review certain parts of the comparison if "the findings on the current exam [were]—[he felt] stand alone." Although

plaintiff's expert contended the standard of care required Dr. Neri to document the comparison in his report, noting the expansion of the gas and that this would constitute an emergency finding, plaintiff failed to explain how Dr. Neri's decision not to do so resulted in a delay in his treatment or diagnosis or otherwise harmed him.

¶ 101    Similarly, plaintiff cannot establish Dr. Neri caused his injury by not "personally" communicating the results of the CT scan to Gillespie. Dr. Neri acknowledged he did not contact Gillespie with his findings after reviewing the CT scan. In his deposition, Dr. Neri explained, while working an evening shift, as he was on July 12, 2021, he was required to focus on "STAT" exams (signifying urgency in response). Plaintiff's July 14 CT scan was ordered STAT. In fact, the timeline of events regarding the July 14 CT scan is telling. The scan was ordered at 4:16 p.m. by Gillespie (it was also charted at 4:16 p.m. by Dr. Azar and noted as an addendum to Gillespie's 3:30 p.m. progress notes). The CT scan began at 5:57 p.m. and ended at 6:32 p.m. Dr. Neri's report interpreting the scan was signed at 7:18 p.m. A CT scan technician called plaintiff's nurse with the results at 7:48 p.m. Furthermore, Dr. Steiger had already been called in after hours to examine plaintiff due to the new concerns regarding his condition. Dr. Steiger noted, at 7:08 p.m., he "came to see [plaintiff] after hours today after he had a CT scan which was prompted from versus diseases [*sic*] being concerned about necrotizing fasciitis." Dr. Steiger noted that although his physical examination of plaintiff did not "appear to be consistent" with Fournier's gangrene, he scheduled plaintiff for surgery the following day for further assessment. This timeline shows plaintiff's care team was well aware of the new concerns regarding necrotizing fasciitis and taking action to investigate these concerns further. As such, plaintiff has failed to establish any delay in his treatment, diagnosis, or care was caused by Dr. Neri not personally calling Gillespie directly with the results of his report.

¶ 102 Because we determined no person of ordinary caution and prudence would develop an honest and strong suspicion that Dr. Neri's purported negligence was a proximate cause of plaintiff's injuries, the trial court's decision to deny the conversion of Dr. Neri to a defendant is affirmed.

¶ 103 4. *Trial Court's Decision to Strike Plaintiff's Amended Expert Reports*

¶ 104 Plaintiff argues his original expert reports filed in support of the conversion of Specialists respondents were sufficient. However, plaintiff contends, assuming, *arguendo*, the reports were deficient, the trial court abused its discretion in not considering the amended expert reports plaintiff filed, without leave of the court, in reply to Specialists respondents response to plaintiff's motion to convert. Plaintiff argues, "when the amended reports are considered, there is no question that Plaintiff has established probable cause to convert" Specialists respondents.

¶ 105 It is well settled that a medical malpractice plaintiff "should be afforded every reasonable opportunity to establish his case." *Steinberg*, 276 Ill. App. 3d at 1042. "[T]o this end, amendments to pleadings are liberally allowed to enable the action to be heard on the merits rather than brought to an end because of procedural technicalities." *Avakian v. Chulengarian*, 328 Ill. App. 3d 147, 154 (2002). This includes amendments to section 2-622 affidavits and expert reports. See *Fox v. Gauto*, 2013 IL App (5th) 110327, ¶¶ 20-21. However, the issue before this court is not the sufficiency of plaintiff's section 2-622 affidavits and expert reports. See *Coley v. St. Bernard's Hospital*, 281 Ill. App. 3d 587, 595 (1996) (holding a plaintiff cannot be required to comply with section 2-622 as to respondents in discovery). Rather, the issue at hand is the trial court's decision to deny consideration of new evidence submitted without leave of the court (the addenda to the expert reports) when determining whether to convert Specialists respondents from respondents in discovery to defendants. The standard of review remains the

same—the trial court's decision to strike plaintiff's amended expert reports rests within its sound discretion. See *Owens v. Riverside Medical Center*, 2020 IL App (3d) 180391, ¶ 23. An abuse of discretion occurs only when the court's ruling is arbitrary, fanciful, or unreasonable or when no reasonable person would take the view of the trial court. *Christmas v. Dr. Donald W. Hugar, Ltd.*, 409 Ill. App. 3d 91, 101 (2011).

¶ 106 Plaintiff's amended expert reports contained addenda sections wherein each expert expanded on his original opinion after having reviewed additional discovery in the form of Dr. Wigginton's and Dr. Neri's deposition transcripts. The expert reviewing Dr. Neri's conduct indicated he also reviewed the interrogatory responses of Dr. Wigginton and Dr. Kim. Both experts reiterated their original opinions regarding the conduct of these doctors. When the trial court asked plaintiff's counsel about the amendments to the expert reports at the hearing, counsel acknowledged "[I]t just is more expansive. It's a bit longer, Judge. That's what I would say." Plaintiff's counsel further stated, "[T]heir opinions about the breaches and deviations from the standard of care are the same, Judge. They didn't add any new criticisms—or I don't think anything substantively changed." Under the circumstances, we cannot conclude the trial court's decision to strike the amended expert reports regarding Dr. Kim and Dr. Neri to be arbitrary, fanciful, or unreasonable.

¶ 107 We note section 2-402 does not require that evidence supporting a finding of probable cause be filed prior to any hearing on the matter. *Coley*, 281 Ill. App. 3d at 594-95. Reviewing courts have held that all the evidence submitted in support of a motion to convert respondents in discovery before or even at the time of the hearing on conversion should be considered by the trial court. *Id.*; *Shanklin v. Hutzler*, 294 Ill. App. 3d 659, 667 (1997). Therefore, courts should liberally allow plaintiffs to present additional evidence for consideration

before ruling on a motion to convert. In this case, however, plaintiff acknowledged there were no substantive changes in the addenda to the expert reports; thus, the court concluded, "[I]t didn't provide any additional findings, and any additional opinions so I'm not quite sure how [plaintiff] would be harmed" by striking the addenda to the expert reports. Furthermore, Specialists respondents had already presented Dr. Wigginton's and Dr. Neri's deposition transcripts to the court; thus, the court had the opportunity to review this evidence in making its determination regarding conversion. As such, it certainly would have been prudent for the court to allow the amended expert reports to be submitted; however, it was not an abuse of discretion for the court to decline to do so in this case.

¶ 108          B. Denial of Plaintiff's Motion to Supplement His Motion for Reconsideration

¶ 109          Plaintiff filed a motion to supplement his motion for reconsideration, adding a new basis for seeking reconsideration and asking the trial court to consider the depositions of Gillespie and McLean. Plaintiff argues the two depositions were newly discovered evidence that was unavailable to plaintiff during the hearing on the motion to convert and included facts establishing probable cause to convert Good and Dr. Kim to defendants. He contends the holdings in *Shanklin* and *Coley* "show that a trial court must consider all materials supporting probable cause to convert, even if they are presented after expiration of the time period to convert" and the conversion hearing. Because we reversed the trial court's decision as to Good and determined he should have been converted to a defendant, we need only address this issue as it relates to Dr. Kim.

¶ 110          We first consider plaintiff's characterization of the decisions in *Shanklin* and *Coley*, both of which addressed the timing of procurement and presentation of evidence with respect to motions to convert respondents in discovery. In both cases, the courts confirmed

- 42 -

evidence supporting a finding of probable cause pursuant to section 2-402 is not required to be filed prior to a hearing on the motion to convert. *Coley*, 281 Ill. App. 3d at 594-95; *Shanklin*, 294 Ill. App. 3d at 666. In *Shanklin*, the court held a plaintiff who timely files a motion to convert should be allowed to present evidence procured even after the statutory conversion deadline, and further, the plaintiff may present evidence to the court at the hearing on the motion to convert. *Shanklin*, 294 Ill. App. 3d at 667 (reversing the trial court's decision that evidence presented on the day of the hearing was barred because the six-month deadline specified in section 2-402 had expired). Similarly, in *Coley*, the court concluded all evidence submitted to the court prior to or at the time of the hearing on conversion should be considered by the trial court. *Coley*, 281 Ill. App. 3d at 594-95. While these cases demonstrate the well-settled principle that the probable cause requirement of section 2-402 should be liberally construed, they do not, as plaintiff suggests, address the circumstances before this court. The issue before us is whether, after a trial court has held a hearing and denied a motion to convert, a plaintiff should be permitted to seek reconsideration of the matter based on evidence known before but procured after the conversion hearing.

¶ 111          Trial courts have the discretion to allow supplemental documents to be filed along with a motion for reconsideration. *Rigoli v. Manor Care of Oak Lawn (West) IL, LLC*, 2019 IL App (1st) 191635, ¶ 18. A reviewing court's decision whether to grant a motion to supplement a motion to reconsider will not be disturbed on appeal absent an abuse of discretion. *Id.* In *Rigoli*, the court found "the standards applicable to reopening the proofs should also apply to the decision to allow the presentation of new evidence with a motion to reconsider." *Id.* That standard requires a court to consider the following:

" 'whether the failure to introduce the evidence occurred because of inadvertence or calculated risk, whether the adverse party will be surprised or unfairly prejudiced by the new evidence, whether the new evidence is of the utmost importance to the movant's case, and whether any cogent reasons exist to justify denying the request.' " *Id.* (quoting *Dunahee v. Chenoa Welding & Fabrication, Inc.*, 273 Ill. App. 3d 201, 210 (1995)).

¶ 112 In this case, plaintiff's failure to introduce the depositions of Gillespie and McLean was not inadvertent; rather, it was a calculated risk. Gillespie and McLean were among the 14 individuals or entities named as respondents in discovery on June 8, 2023; thus, they were known to plaintiff, but plaintiff did not depose them until after the hearing and decision on his motion to convert Dr. Kim. By definition, plaintiff believed Gillespie and McLean "to have information essential to the determination of who should properly be named as additional defendants in the action." 735 ILCS 5/2-402 (West 2022). Plaintiff had to have known the risk moving forward without this evidence and did so anyway. Further, both witnesses were deposed less than a month after the hearing on the motion to convert, yet plaintiff took no action to secure a continuance of the hearing in anticipation of those depositions being heard.

¶ 113 As a respondent in discovery, Dr. Kim was never a party to this lawsuit (see *Torrijos v. International Paper Co.*, 2021 IL App (2d) 191150, ¶ 109), and his obligations as a respondent in discovery were terminated by the trial court on March 12, 2024. Although plaintiff filed a motion for reconsideration that same day, the basis for reconsideration was a misapplication of the law. It was not until a month later, on April 10, 2024, that plaintiff sought to add "newly discovered evidence" as basis for reconsideration. Dr. Kim and his counsel were no longer participants in the discovery process, and they were not present for Gillespie's or

McLean's depositions. As previously stated, plaintiff knew of those witnesses prior to the hearing on the motion for conversion and did not depose them prior to the hearing or seek a continuance of the hearing to obtain their testimony. We conclude it is unfair to Dr. Kim for plaintiff to seek to reopen the issue regarding conversion under these facts.

¶ 114          Further, the depositions of Gillispie and McLean, as they relate to Dr. Kim, cannot be characterized as being of "utmost importance" to plaintiff's case. Both witnesses testified as to what Dr. Kim acknowledged in his response to interrogatories—he did not mention the presence of gas in plaintiff's penis in his findings after reviewing plaintiff's July 11 CT scan. The testimony of both witnesses was otherwise consistent with the expert report regarding the standard of care and what should have been done (what they would have done) if Dr. Kim's report included the finding. Plaintiff's argument these depositions disprove Dr. Kim's argument that it was "undisputed" all plaintiff's medical providers knew about the CT scan results is a mischaracterization of Dr. Kim's argument and contradicted by the record. The record reveals the CT scan results were in plaintiff's medical chart and members of plaintiff's clinical team charted they had reviewed the results. On this topic, the depositions of Gillespie and McLean are not of utmost importance, as they simply corroborated what was already in the evidence before the trial court. Gillespie testified, and the medical records confirmed, she read the July 11 CT scan report, but she did not believe she reviewed the actual images in the study. McLean also testified, and the medical records confirmed, he reviewed the July 11 CT scan results, but he stated it would not have been within the scope of his specialty to review the actual images.

¶ 115          Although discovery is an ongoing and often time-consuming process, section 2-402 of the Code requires plaintiffs to act within a specific time frame with respect to individuals or entities they have named as respondents in discovery. In this case, plaintiff filed his motion to

convert within the statutory time frame, plaintiff conducted discovery, the parties briefed the issue, the trial court held a hearing and heard arguments, and the court determined there was insufficient evidence to establish probable cause for an action against Dr. Kim. One month later, plaintiff sought to revisit the issue based on evidence known to him and certainly attainable prior to the hearing, even if he had to ask for a continuance. Although a plaintiff in a medical malpractice case should be afforded every reasonable opportunity to establish his case (*Steinberg*, 276 Ill. App. 3d at 1042), courts must also consider interests of finality and efficiency when asked to consider late-tendered evidentiary material (*Gardner v. Navistar International Transportation Corp.*, 213 Ill. App. 3d 242, 248-49 (1991)). Plaintiff had the time and ability to procure this evidence prior to the hearing on the motion to convert Dr. Kim or at least seek a continuance of the hearing to be able to do so. Under these circumstances, he should not be permitted to gather evidentiary material after the fact to show the court erred in its ruling (*id.* at 248), essentially seeking a "second bite at the apple."

¶ 116        Based on the foregoing, we conclude the trial court did not abuse its discretion in denying plaintiff's motion to supplement his motion to reconsider the conversion of Dr. Kim.

¶ 117                    C. Denial of Plaintiff's Motion to Reconsider

¶ 118        Although plaintiff raises the trial court's denial of his motion to reconsider as an issue on appeal, he has failed to make any argument or cite any authority supporting this contention. Instead, plaintiff's argument exclusively focuses on the evidence he sought to have considered in his supplement to his motion for reconsideration, which was not allowed and not argued at the hearing on the motion for reconsideration. Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) requires an appellant's brief to contain the appellant's argument with citation to authority and the pages of the record relied on. The rule further provides "[p]oints not argued

are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." *Id.* The rules governing briefs are not "mere suggestions." *Niewold v. Fry*, 306 Ill. App. 3d 735, 737 (1999). Their purpose is "to require parties before a reviewing court to present clear and orderly arguments so that the court can properly ascertain and dispose of the issues." *Hall v. Naper Gold Hospitality LLC*, 2012 IL App (2d) 111151, ¶ 7. Because plaintiff has presented no argument and cited no authority relating to the grounds upon which the motion to reconsider was denied, this issue is forfeited. Therefore, we affirm.

¶ 119                                   III. CONCLUSION

¶ 120          For the reasons stated, we affirm in part and reverse in part the trial court's judgment.

¶ 121          Affirmed in part and reversed in part.